## In re STILLMAN.

[Cite as *In re Stillman*, 155 Ohio App.3d 333, 2003-Ohio-6228.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2003–A–0063.

Decided Nov. 19, 2003.

334

Laura M. DiGiacomo, for appellee.

Jonathan W. Winer, for appellant.

Jane L. Lesko, guardian ad litem.

---

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, Alfred E. Hannold Jr. ("Hannold"), appeals from the judgment entered by the Ashtabula County Court of Common Pleas, Juvenile Division. The trial court terminated Hannold's parental rights when it granted permanent custody of his daughter, Debbie Stillman ("Debbie"), to appellee, the Ashtabula County Children Services Board.

{¶ 2} Debbie is the child involved in this action. She was born in August 1997. Hannold is Debbie's natural father. Debra Stillman ("Debra") is Debbie's natural mother. Hannold and Debra were never married and did not live together during any of the relevant time periods of these proceedings.

{¶ 3} Debbie has a variety of medical ailments, including juvenile rheumatoid arthritis. This condition has resulted in Debbie's legs being severely bent. She has undergone several surgeries and takes medication for this condition.

{¶ 4} In January 2000, appellee filed for temporary custody of Debbie, due to allegations that Debra was not providing adequate medical treatment.

{¶ 5} In April 2000, Debbie was returned to Debra's care with an order of protective supervision. A condition of this placement was that Debra would cooperate with Shriner's Hospital in the medical treatment of Debbie. However, in May 2000, Debbie did not show up for her scheduled admission to the hospital. Thereafter, on May 12, 2000, appellee was again granted temporary custody of Debbie.

{¶ 6} On May 22, 2000, Hannold petitioned the court for temporary custody of Debbie. He was not immediately granted visitation or made part of the case plan because of the uncertainty of his status as Debbie's father. Debra reportedly informed appellee that another individual was Debbie's father. Further, she indicated that if Hannold was Debbie's father, it was because he raped her. Appellee later determined that the rape accusations to be unfounded.

{¶ 7} Hannold had a paternity test conducted in 1998. This test indicated that he was Debbie's father to a certainty in excess of 99.9 percent. However, this was not recognized by appellee. A second test was conducted, which also established that Hannold was Debbie's father with a certainty in excess of 99.9 percent. Appellee's case plan was amended to include Hannold in April 2001. This plan was approved by the court in May 2001.

{¶ 8} Initially after being added to the case plan, there were several objectives set forth for Hannold to meet. He needed to attend parenting classes. He needed to attend literacy classes. He also had to find suitable housing, because, at the time, Hannold was living in an apartment above a business that he considered inadequate.

{¶ 9} Hannold has an IQ in the low seventies. At the time of the hearing, he was living with a female companion, Barbara Grey, and her two adult sons. Carrie Colby, the caseworker assigned to this case, indicated that this was adequate housing.

{¶ 10} Hannold was granted visitation with Debbie. He was also permitted to attend physical therapy sessions with her. Debra Hills, the physical therapist overseeing Debbie's treatment, testified that Hannold had difficulty learning to assist Debbie in two of three exercises she needed. However, she did indicate that Debbie would "shut down" and resisted doing her exercises if she was nervous or uncomfortable.

{¶ 11} After Debbie was taken from Debra's custody the second time, Debra has been virtually nonexistent in these proceedings. She did not appear at the final hearing and is not a party to this appeal.

{¶ 12} Due to Debra's absence, the goal of the case plan was permanent custody. This goal was changed to placement with Hannold in October 2001. However, it was returned to permanent custody in January 2002, when, on January 11, 2002, appellee filed a motion for permanent custody.

{¶ 13} On January 28, 2002, Hannold filed a motion for summary judgment. On May 9, 2002, appellee filed its brief in opposition. The trial court did not rule on Hannold's motion for summary judgment prior to the adjudicatory hearing, in September 2002. At the hearing, the trial court orally overruled Hannold's motion for summary judgment. Then, in April 2003, in the final judgment entry

in which it rendered its ultimate decision, the trial court overruled Hannold's motion for summary judgment.

{¶ 14} A hearing was held on appellee's motion for permanent custody in September 2002. Peter Laveck and Carrie Colby, caseworkers of appellee assigned to the case, testified. In addition, Dr. Patricia Gillette testified at length regarding her opinion as to what would be in Debbie's best interest. Based upon the interviews she conducted with all of the key characters and the tests she performed on Hannold, Dr. Gillette concluded that it would be in Debbie's best interest for the motion for permanent custody to be granted.

{¶ 15} Specifically, Dr. Gillette stated:

{¶ 16} "[Hannold] does not have the ability to comprehend [Debbie's] medical needs, to be able to discuss [Debbie's] needs, emotional, physical, medical, with the physician and other medical personnel * * *. The progression of juvenile rheumatoid arthritis is chronic and her health can deteriorate. You cannot really predict what is going to happen in the future, and so she may have great emotional problems in the future. I don't believe he would be able to handle these. For example, I know she is on a number of medications. His arithmetic is at a first grade level and his spelling is at a first grade level. I don't know if he really would be able to continually monitor and maintain the correct dosages, the correct timing of her different physical therapies, medical examinations, appointments and physical therapy."

{¶ 17} Dr. Gillette also opined that Hannold's deficiencies are not something that he could improve upon over time. She concluded, "I just didn't think [Hannold] even understood what was going on with his daughter or the emotional, medical problems that she was facing."

{¶ 18} Carrie Colby, one of the caseworkers involved in this case, echoed many of Dr. Gillette's concerns regarding Hannold's ability to comprehend Debbie's medical needs and to participate in his daughter's physical therapy. Colby testified that she attempted to train Hannold as to what he needed to do to aid Debbie in her physical therapy sessions, which included three basic exercises. However, it became apparent that Hannold was unable or unwilling to learn them correctly. He also failed to understand the importance of performing the required exercises and would allow Debbie to decide whether or not she wanted to do the exercises.

{¶ 19} Additionally, during home visits, it became apparent that Hannold would not always provide proper supervision. He permitted Debbie to play on an unsafe swing set despite being told not to, as well as play with gasoline cans in the yard. He also kept lighter fluid and various medications on the coffee table

within reach of Debbie. In short, Hannold appears unable to appreciate the dangers that he exposed his daughter to during home visits.

{¶ 20} The court issued its judgment entry granting appellee's motion for permanent custody. The court granted the motion pursuant to R.C. 2151.414(B)(1)(d). In regard to Hannold, the court found that Debbie had been in the temporary custody of appellee for more than 12 of the past 22 months. The trial court determined that it was in the best interest of Debbie to grant appellee's motion for permanent custody.

{¶ 21} Hannold has timely appealed the judgment of the trial court. He raises seven assignments of error on appeal:

{¶ 22} "[1.] The trial court erred in disregarding a parent's fundamental right to raise his child, in violation of the Due Process and Equal Protection Provisions of the Ohio Constitution and the United States Constitution.

{¶ 23} "[2.] The trial court abused its discretion, pursuant to O.R.C. 2151.414(B)(1)(d), by terminating parental rights without a finding of parental unfitness.

{¶ 24} "[3.] The trial court erred in concluding that Ashtabula County Children Services Board made reasonable efforts to reunify father with his child.

{¶ 25} "[4.] The trial court erred in failing to conclude that Alfred E. Hannold, Jr. substantially remedied the conditions which caused the removal of the child.

{¶ 26} "[5.] The trial court erred by denying the father's motion for summary judgment.

{¶ 27} "[6.] O.R.C. 2151.414, facially and as applied, violates the Substantive Due Process, Equal Protection and Procedural Due Process guarantees of the Ohio Constitution and the United States Constitution by failing to [recognize] or protect a parent's fundamental right to raise his own child."

{¶ 28} "[7.] The trial court erred in admitting into the record Dr. Gillette's opinions and conclusions regarding the adequacy of Alfred E. Hannold Jr.'s parenting ability."

{¶ 29} We will address these assigned errors out of order.

{¶ 30} In his sixth assignment of error, Hannold challenges the constitutionality of R.C. 2151.414(B)(1)(d). He asserts that this provision allows for the termination of parental rights without requiring a showing of parental unfitness. He also claims that the time limit provision of R.C. 2151.414(B)(1)(d) is overbroad and arbitrary. However, Hannold did not challenge the constitutionality of this statute at the trial court level; thus, he has waived subsequent challenges on appeal. *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277,

syllabus. While this court has recognized that a waiver does not prohibit an appellate court from considering a constitutional challenge to a statute, *State v. Schlee* (Dec. 17, 1999), 11th Dist. No. 98–L–187, 1999 WL 1313651, citing *In re M.D.* (1988) 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus, we choose not to do so in the instant cause.

{¶ 31} In his fifth assignment of error, Hannold claims that the trial court erred by overruling his motion for summary judgment.

{¶ 32} Pursuant to Civ.R. 56(C), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. In addition, it must appear from the evidence or stipulations that reasonable minds can come to only one conclusion, which is adverse to the nonmoving party. Civ.R. 56(C). The standard of review for the granting of a motion for summary judgment is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

{¶ 33} R.C. 2151.414 pertains to permanent custody hearings and states:

{¶ 34} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

{¶ 35} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 36} "(b) The child is abandoned.

{¶ 37} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

{¶ 38} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶ 39} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of

the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

{¶ 40} R.C. 2151.414(D) provides:

{¶ 41} "In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

{¶ 42} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 43} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard to the maturity of the child;

{¶ 44} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

{¶ 45} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ 46} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 47} Hannold argued that the agency's motion for permanent custody must fail as a matter of law.  However, based on the above standard of R.C. 2151.414(B)(1)(d), which the court used in this case, there were genuine issues of material fact to be resolved.  The agency submitted an affidavit from caseworker Carrie Colby, who stated that Debbie had been in the temporary custody of appellee for 22 of the past 22 months.  Therefore, the court was required to look to the best interest analysis of R.C. 2151.414(D).  Reviewing the totality of the circumstances of this case, including Debbie's medical conditions, we cannot say that reasonable minds could come to only one conclusion, that being a grant of permanent custody to appellee was not in Debbie's best interest.  In fact, the trial court ultimately reached the opposite conclusion.  Thus, the trial court did not err by overruling Hannold's motion for summary judgment.

{¶ 48} Hannold's fifth assignment of error is without merit.

{¶ 49} In his first, second, and fourth assignments of error, Hannold asserts that the trial court failed to make certain findings prior to terminating his parental rights.  Specifically, Hannold argues that the trial court never made an express finding that he was unfit as a parent.  He further argues that a finding that R.C. 2151.414(B)(1)(d) has been met only creates a presumption of unfitness,

which the parent is then permitted to rebut. He contends that he, in fact, rebutted that presumption. Finally, he asserts that the trial court erred by not mentioning that a parent has a constitutional right to raise his own child.

{¶ 50} The statute in question does not require that the trial court make any of these findings. There is no requirement that a parent be expressly declared unfit, nor is there any requirement that a trial court acknowledge that a parent has a constitutional right to raise his own child.

{¶ 51} The trial court in the present case proceeded under R.C. 2151.414(B)(1)(d). Under this section, the trial court needed to find only that Debbie had been in the temporary custody of appellee for 12 or more months of a consecutive 22 month period ending on or after March 18, 1999. Once that finding was made, the trial court properly continued to the second question, whether an award of permanent custody to appellee was in Debbie's best interests. It was unnecessary to reach any other findings regarding the unfitness of her parents. *In re Cather*, 11th Dist. Nos. 2002–P–0014, 2002–P–0015, and 2002–P–0016, 2002-Ohio-4519, 2002 WL 2022964 ¶ 42–43.

{¶ 52} Accordingly, the trial court did not have an obligation to expressly determine that Hannold was an unfit parent. This issue was addressed by the Fourth District Court of Appeals in *In re Workman*, 4th Dist. No. 02CA574, 2003-Ohio-2220, 2003 WL 2012574. There, the court opined that while "[a] parent has a 'fundamental liberty interest' in the care, custody, and management of his or her child and an 'essential' and 'basic civil right' to raise his or her children," the parent's rights are not absolute and " 'are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " Id. at ¶ 36, quoting *In re Cunningham* (1979), 59 Ohio St.2d 100, 106, 13 O.O.3d 78, 391 N.E.2d 1034.

{¶ 53} The *Workman* court concluded that R.C. 2151.414(B)(1)(d) protected the parents' rights based upon the following logic:

{¶ 54} "[W]e believe that inherent within R.C. 2151.414(B)(1)(d) rests the finding that the parent is unable, unsuitable, or unfit to care for the child. If the child has been placed in a children services agency's temporary custody for at least twelve months of the prior twenty-two months, some reason must exist why the child has not been in the parent's care. The reason normally would be because the parent has been unable to demonstrate that the parent is able, suitable, or fit to care for the child. Cf. *Troxel* [*v. Granville* (2000) ], 530 U.S. [57] at 68–69 [120 S.Ct. 2054, 147 L.Ed.2d 49]. ('Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.'). R.C. 2151.414(B)(1)(d) thus contains an

implicit presumption that the parent is unable, unsuitable, or unfit to care for the child. In enacting R.C. 2151.414(B)(1)(d), it appears that the Ohio General Assembly intended to provide a presumption that a parent who is unable to be reunified with the child within a twelve-month period is necessarily unable, unsuitable, or unfit to care for the child. See *In re Fricke*, Allen App. Nos. 1–02–75, 1–02–76, and 1–02–77, 2003-Ohio-1116, 2003 WL 952173. ('Once the children have been in custody for 12 of the previous 22 months, the parents are presumed to be unfit and all the trial court must find is that granting permanent custody is in the best interests of the children.').

{¶ 55} "We do not believe that R.C. 2151.414(B)(1)(d) deprives a parent of fundamentally fair procedures. Prior to instituting a permanent custody proceeding under R.C. 2151.414(B)(1)(d), the parent has twelve months to demonstrate that the parent is able, suitable, or fit to care for the child. Thus, the parent is not deprived of the ability to be reunified with the child or to demonstrate the parent's ability, suitability, or fitness to care for the child." Id. at ¶ 39, 40.

{¶ 56} We agree with the analysis set forth in the *Workman* decision. The fact that a children services agency has had temporary custody of a child for at least 12 months of the prior 22 months is a definite indication that a parent is unable, unsuitable, or unfit to adequately care for the child. That is precisely what happened in the case sub judice. Debbie had been in the temporary custody of appellee for the previous 28 months at the time of the hearing. Hannold established his paternity, and was involved with the case, 16 months prior to the hearing. Hannold had ample opportunity to demonstrate his parenting abilities. However, the evidence presented supports a conclusion that Hannold, despite his best efforts to comply with the case plan, was simply not capable of providing the type of parenting that was required by this "special needs" child. That is what makes this decision so difficult.

{¶ 57} Based upon the foregoing analysis, Hannold's first, second, and fourth assignments of error are without merit.

{¶ 58} In the third assignment of error, appellant contends that the trial court erred by concluding that appellee made reasonable efforts to reunify Debbie with her father. While appellant is correct in his assertion that the trial court made this finding, the fact is that no such finding is required under the statute. When considering a motion for permanent custody brought pursuant to R.C. 2151.414(B)(1)(d), other than the 12–month time requirement, the only other consideration that the trial court needs to address is the best interest of the child. Accordingly, whether or not the trial court was correct in concluding that reasonable efforts were made to reunify the child with her father is irrelevant.

{¶ 59} Hannold's third assignment of error is without merit.

{¶ 60} In the seventh assignment of error, appellant maintains that the trial court erred by permitting the testimony of Dr. Gillette regarding the adequacy of his parenting because Dr. Gillette relied heavily on hearsay reports provided to her by appellee.

{¶ 61} Evid.R. 703 provides, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted into evidence."

{¶ 62} Evid.R. 801(C) provides, " 'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶ 63} It is appellant's contention that, over his attorney's objection, Dr. Gillette was permitted to testify to information she obtained from reports prepared by appellee. Thus, appellant argues that this information constitutes hearsay and was, therefore, inadmissible pursuant to this court's holding in *In re Walker*, 11th Dist. No. 2002–A–0089, 2003-Ohio-799, 2003 WL 474124.

{¶ 64} To begin with, appellant has failed to support his claim that objections were made with citations to the record. It appears to this court that, in fact, there were no objections made to the testimony in question. Accordingly, appellant has waived this issue and cannot raise it for the first time on appeal. *State ex rel. Zollner v. Indus. Comm.* (1993), 66 Ohio St.3d 276, 278, 611 N.E.2d 830.

{¶ 65} Moreover, even if this argument had been properly preserved, it is clear that it must fail. It is well established that, "when an expert's opinion is based, in whole or in major part, on facts or data perceived by him, then the requirements of Evid.R. 703 are satisfied." *Ryser v. Conrad* (Dec. 7, 2001), 11th Dist. No. 2001–T–0034, 2001 WL 1561795, citing *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118, syllabus; *Farkas v. Detar* (1998), 126 Ohio App.3d 795, 798, 711 N.E.2d 703.

{¶ 66} In the *Walker* case, it is apparent that the expert witness relied heavily on the reports of other doctors, social workers, law enforcement agencies, and the children services agency, to form her opinion on whether permanent custody should be granted. That report was admitted into evidence. In contrast, in the present case, Dr. Gillette relied, in major part, on her own observations that resulted from interviewing appellant, Debbie, Debbie's foster parents, and the physical therapist, and her own test results. Dr. Gillette testified that while she read the reports that resulted from two previous psychological examinations of appellant, she found them to be "not helpful" as

some of the tests had been improperly administered. Additionally, Dr. Gillette's report, itself, was never admitted into evidence in this case. Thus, this case is clearly distinguishable from the *Walker* case.

{¶ 67} Accordingly, appellant's seventh assignment of error is without merit.

{¶ 68} The judgment of the Ashtabula Court of Common Pleas, Juvenile Division, is hereby affirmed.

Judgment affirmed.

DONALD R. FORD, P.J., concurs.

WILLIAM M. O'NEILL, J., dissents.

WILLIAM M. O'NEILL, Judge, dissenting.

{¶ 69} I must respectfully dissent.

{¶ 70} In his sixth assignment of error, Hannold challenges the constitutionality of R.C. 2151.414(B)(1)(d). Cases terminating parental rights present an extremely difficult balancing of parents' fundamental liberty interest to raise their child and the state's important interest in ensuring the safety and well-being of its children. Although Hannold did not challenge the constitutionality of this statute at the trial court level, I believe this is an appropriate instance to exercise the discretion to consider this important constitutional challenge to a statute.[1] Further, I agree with appellant that R.C. 2151.414(B)(1)(d), facially and as applied, is unconstitutional.

{¶ 71} The Supreme Court of Ohio has recognized the importance of parents' rights to raise their children. " 'Permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." * * * Therefore, parents "must be afforded every procedural and substantive protection the law allows." ' " [2]

{¶ 72} Moreover, both the Supreme Court of Ohio and the United States Supreme Court have recognized parental rights as fundamental liberty interests. This is apparent in the following language:

{¶ 73} " 'The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the

---

1. See *State v. Schlee* (Dec. 17, 1999), 11th Dist. No. 98–L–187, 1999 WL 1313651, citing *In re M.D.* (1988) 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus.

2. *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, at ¶ 14, quoting *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 601 N.E.2d 45.

State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.' " [3]

{¶ 74} Finally, the United States Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." [4]

{¶ 75} Because a fundamental constitutional right is at issue, the constitutionality of R.C. 2151.414(B)(1)(d) must be reviewed using a strict-scrutiny analysis.[5] Thus, the statute must be narrowly tailored to serve a compelling state interest.[6]

{¶ 76} The state's interest in protecting its children from abuse and neglect is compelling. However, R.C. 2151.414(B)(1)(d) is not narrowly tailored to achieve that interest. This is because it does not require the children services agency to prove, or the trial court to find, that the natural parents are unfit or unsuitable to raise their children.

{¶ 77} The Supreme Court of Ohio has acknowledged that a finding of parental unsuitability is necessary in a custody dispute between a natural parent and a nonparent.[7] While the *Hockstok* case involved a dispute between a parent and a grandparent and was decided pursuant to R.C. 3109.04, there is no reason why this requirement should not apply to custody disputes adjudicated under R.C. 2151.414. Specifically, the Supreme Court of Ohio held that " 'the general rule in Ohio regarding original custody awards in disputes between a parent and a nonparent is that "parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." ' " [8]

---

3. Id. at ¶ 16, quoting *Santosky v. Kramer* (1982), 455 U.S. 745, 753–754, 102 S.Ct. 1388, 71 L.Ed.2d 599.

4. *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49.

5. *State v. Thompson,* 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, at ¶ 13; see, also, *Troxel v. Granville,* 530 U.S. at 80, 120 S.Ct. 2054, 147 L.Ed.2d 49 (Thomas, J., concurring).

6. Id.

7. . *In re Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, syllabus.

8. Id. at ¶ 21, quoting *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 65, 22 OBR 81, 488 N.E.2d 857, quoting *In re Perales* (1977), 52 Ohio St.2d 89, 97, 6 O.O.3d 293, 369 N.E.2d 1047.

{¶ 78} Pursuant to R.C. 2151.414(B)(1)(d), once a trial court finds that a child has been in the temporary custody of a children service agency for 12 months of a 22 month period, it may proceed to the best interest determination set forth in R.C. 2151.414(D). The time limit of 2151.414(B)(1)(d) is entirely arbitrary, as it does not require the court to consider (1) why the child was initially placed in temporary custody, (2) why the child has remained in temporary custody for more than a year, including any delays caused by the agency or other persons involved in the case, (3) improvements the parent has made to achieve reunification, or, ultimately, (4) the parents' ability to raise their child. Rather, all the evidence the children services agency needs to present to meet this criterion is the date of temporary placement and a calendar.

{¶ 79} Cases involving the termination of parental rights are often very complex. There are many competing interests involved. The child, caseworkers, natural parent(s), foster parent(s), psychologists, doctors, attorneys, and others involved must complete a variety of tasks before there is a final permanent custody hearing. However, as all the various tasks and reports are being completed, the "statute of limitations" is running against the natural parents. Should 12 months pass, the children services agency is halfway home on the battle for permanent custody. R.C. 2151.414(B)(1)(d) has already been met. The only hurdle left is to show that the grant of permanent custody is in the child's best interest.[9]

{¶ 80} In addition, the children services agency files the motion for permanent custody. The natural parents have no control over the timeliness of the filing of the motion. The current statutory framework entices the agency to wait to file the motion for permanent custody until the child has been in their custody for twelve months. Why would an agency file a motion for permanent custody early, when it could wait to file until after 12 months have passed, and go right to the best interest phase?

{¶ 81} Simply stated, R.C. 2151.414(B)(1)(d) does not protect natural parents' fundamental rights concerning the care, custody and control of their children.

{¶ 82} Moreover, the best interest analysis of R.C. 2151.414(D) does not force the trial court to find that a parent is unfit or unsuitable to raise their child.

{¶ 83} Not only is the arbitrary time requirement being used against a parent once pursuant to R.C. 2151.414(B)(1)(d), the same time requirement is a specific factor to be used when considering the best interest of the child.[10] Accordingly, if the child has been in the temporary custody of a children services agency more

---

9. See R.C. 2151.414(B) and (D).

10. R.C. 2151.414(D)(3).

than 12 months, there are two strikes against the parent, *regardless of the underlying circumstances that caused the placement.*

{¶ 84} In addition to the time requirement, other factors of the best interest analysis consider the child's relationship with its foster parents and current placement situation.[11] This is entirely unfair to the natural parents. Foster parents, presumably, will always be "fit," as they must have met certain screening criteria to become foster parents. Moreover, if the child has been in the custody of the agency for more than a year, it is likely the child has been in the home of the foster parents for that time. In most every case, the child, especially a young child, is going to have a stronger bond to the foster parents, who interact with them on a daily basis, than to the natural parents, whom they see only for minimal times during structured visitation.

{¶ 85} Pursuant to the current version of R.C. 2151.414, after finding that the child has been in the temporary custody of a children service agency for 12 out of the past 22 months, the trial court proceeds to the best interest factors of R.C. 2151.414(D). Accordingly, the court is not required to find any level of unfitness or inability on behalf of the natural parent. Presumably, all the court would need to find is that the child would be better off if permanent custody was granted to the children service agency, so the child could be adopted by the "better" foster parents.

{¶ 86} Moreover, the "best-interest" analysis of R.C. 2151.414(D), suggests a presumption in favor of granting a motion for permanent custody. Specifically, R.C. 2151.414(D)(4) asks the court to consider whether the child's need for legally secure placement "can be achieved *without* a grant of permanent custody to the agency." (Emphasis added.) How does this language ensure natural parents their "paramount" right to the custody of their children?

{¶ 87} Appellee argues that R.C. 2151.414 does provide adequate procedural safeguards for parents. Appellee cites *In re Thompson,* where the Tenth Appellate District held that the legislature has ensured constitutional safeguards by providing for "adequate notice, assistance of counsel, and (under most circumstances) the right to be present" at these proceedings.[12] However, these important safeguards do not address my paramount concern, which is R.C. 2151.414(B)(1)(d) does not require a finding of wrongdoing, unfitness, or unsuitability. Remembering that these cases are the family law equivalent of the death penalty, adopting appellee's position would be analogous to a criminal defendant being provided with the right to counsel, the right to confront witnesses, etc, but,

---

11. See R.C. 2151.414(D)(1), (3), and (4).

12. See *In re Thompson* (Apr. 26, 2001), 10th Dist. No. 00AP–1358, 2001 WL 424044.

instead of requiring he be found guilty of the crime, only requiring the state to show it is in the public's best interest to send this individual to prison.

{¶ 88} The majority cites the Fourth District's holding in *In re Workman,* for the inference that R.C. 2151.414(B)(1)(d) carries a presumption of unfitness.[13] Essentially, this "presumption" is "if the parent were fit, the child would not be in the state's custody."

{¶ 89} I disagree with the above analysis, as it raises several constitutional concerns. The initial problem with the "presumption" reasoning, is that it is factually incorrect. Children can be placed in the temporary custody of a children services agency for a variety of reasons. Such placement is not, per se, indicative of improper acts on behalf of the parent. For instance, in the case sub judice, the uncontested evidence presented by appellee was that Hannold was not responsible for the child's temporary placement with appellee. The evidence clearly established that the reason for the child's placement was the neglect of the child's mother. Hannold did not live with the child's mother and had no means of controlling her actions. How can there be a presumption that he is unfit to care for his daughter?

{¶ 90} The second concern is that the children services agency is determining that the parent continues to be "unfit" while the child is in its custody. Permitting a determination of unfitness to be made by a caseworker, rather than a court of law, is fundamentally unfair. Allowing an order of temporary custody (even if a parent was not involved in the temporary custody hearing) and subsequent continuing placement with children services, to be a presumption of "unfitness" is a violation of a parent's constitutional rights, as they are being deemed an "unfit" parent, without the constitutional safeguards designed to protect them from untrue allegations.

{¶ 91} By the time paternity was legally established and Hannold was involved in the case, nearly a year had passed since the child had been removed from her mother the second time. While there were several factors that contributed to this delay, the children services agency benefited, as the time limitations were running for the duration of this process. At the time of the permanent custody hearing, the child had been in the temporary custody of appellee in excess of twelve months. The only question before the court was "was it in the best interest of the child to grant appellee's motion for permanent custody." The court was permitted to consider the child's relationship with her foster parents as a factor for terminating Hannold's parental rights. The trial court was not required to find that Hannold was unfit or unsuited to raise his child. Hannold

---

13. *In re Workman,* 4th Dist. No. 02CA574, 2003-Ohio-2220, 2003 WL 2012574, at ¶ 39. (Citations omitted.)

was entitled to a higher burden of proof before his fundamental constitutional right was terminated.

{¶ 92} R.C. 2151.414(B)(1)(d) permits a court to terminate parents' rights to raise their children without finding that the child should not, or could not, be placed in the parents' home. Rather, the court is merely required to consider whether it is in the "best interest" of the child for permanent custody to be given to the children service agency. Thus, an individual's fundamental right to raise their child may be extinguished by the court finding that the child will be better off with her foster parents. This proposition is in direct conflict with the constitutional safeguards that have been continuously reiterated by the Supreme Court of Ohio and the United States Supreme Court.[14]

{¶ 93} I recognize the legislature's intent to shift emphasis to the well being of the child. However, R.C. 2151.414(B)(1)(d) is not narrowly tailored to accomplish the state's interest, because it allows for parents' fundamental rights to raise their children to be terminated without any finding of wrongdoing or unsuitability.

---

14. See, e.g., *In re Hoffman* and *Santosky v. Kramer,* supra.