DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, in a termination of parental rights case. Because we conclude that the trial court did not err in its findings, we affirm.
 {¶ 2} Appellant, Tony C. ("father"), is the biological father of Tyler C, born in 1999, and Tyler's two half-brothers, Anthony C. ("Ryan"), and Jakota C. ("Cody"). *Page 2 
Appellant, Dawn C. ("mother"), now married to father, is Tyler's biological mother. In February 2003, Lucas County Children Services ("LCCS") filed a complaint in dependency, neglect, and abuse against mother and father, and was given temporary emergency custody of Ryan, then age 14, and Cody, then age 13. Tyler, then age three and a half, also included in the complaint, was allowed to remain in mother's care, subject to LCCS protective supervision, because she was not married to father at that time and father was not living in the household. A case plan was initially filed in March 2003, with Ryan and Cody placed in a foster home together.
 {¶ 3} By agreement of the parties at a hearing held on April 15, 2003, Ryan and Cody were adjudicated to be dependent and abused and remained in LCCS' temporary custody. In a May 1, 2003 judgment entry, Tyler was adjudicated to be a dependent child, based upon conditions in the home, including physical abuse by father of mother, Ryan and Cody, and father's drug and alcohol abuse. Because mother said she was leaving father, the court awarded legal custody of Tyler to mother, but retained LCCS' protective supervision. Sometime in late 2003, however, mother tested positive for illegal drugs in a urine screen.
 {¶ 4} In December 2003, LCCS filed a motion to change disposition and the court granted the agency temporary custody of Tyler, finding that mother could not care for him because of illegal drug use and medical issues. Tyler was then placed in the foster home with Ryan and Cody. In March or April 2004, Ryan allegedly sexually molested Tyler, and was removed from the foster home. In April and June 2004, the *Page 3 
agency was awarded legal custody of Ryan and Cody. After admitting to the sexual abuse allegations, Ryan was ultimately placed in a residential treatment program at Abraxas, a facility located in Shelby, Ohio, in April 2005. Father, at first, accepted that Ryan had abused Tyler, but later rejected those allegations. Father refused to visit with Ryan at Abraxas during the eight to nine months he was there, even though transportation from Toledo to Shelby and back was offered to father. When LCCS accommodated father's request for a visit in Toledo and arranged a furlough for Ryan at Christmas in 2005, Ryan then failed to return to Abraxas. Consequently, Ryan never completed the sexual offender program.[1] Ryan was later apprehended and place in another foster home.
 {¶ 5} The LCCS case plan was amended in March 2004, to terminate visitation with mother after Tyler stated in therapy that mother had sexually molested him sometime prior to his removal from mother's custody. In late October 2004, father filed for legal custody of all three boys. Due to the allegations of sexual and substance abuse against mother and the history of domestic violence issues, father indicated to LCCS caseworkers that he was no longer in a relationship with mother and the two lived apart.
 {¶ 6} In November 2004, LCCS filed for permanent custody of Ryan and Cody. In January 2005, LCCS asked the juvenile court to issue a final dispositional order granting the agency temporary custody of Tyler. Although Tyler had been placed in temporary custody based upon the December 2003 initial shelter care hearing, the change *Page 4 
in disposition order had not been issued. LCCS also requested that visits with father be terminated, to prevent any undue influence from father regarding a scheduled in camera interview between the court and Tyler. In March 2005, the court terminated father's visitations and entered disposition of temporary custody to the agency.
 {¶ 7} Over the next year, the parents filed and withdrew motions for visitations. The parents expressed frustration with the agency, and refused to submit to requested drug screens. At some point between March 2005 and June 2005, mother and father were married and were again residing with each other. For many months, the agency caseworker did not know where they were living and they did not contact her.
 {¶ 8} In March 2006, LCCS moved the court for permanent custody of Tyler. During hearings conducted over six days, spanning a seven month time period, the parties presented the following witnesses and evidence.
 {¶ 9} The court began the disposition hearing on August 30, 2006. LCCS presented the following witnesses and evidence. The following witnesses testified on behalf of LCCS:
 {¶ 10} (1) Pam Eckel, an expert in social work and Children's Advocacy Center counselor of sexually abused children, Tyler's therapist in November 2004;
 {¶ 11} (2) Tara Meckly, counselor from mother's sexual offender treatment group;
 {¶ 12} (3) Holly Traxler, LCCS caseworker prior to August 2004;
 {¶ 13} (4) Suzanne Hall, father's clinical counselor from May to July 2004; *Page 5 
 {¶ 14} (5) Patrick Tucker, LCCS security worker, supervisor of father's visits at agency;
 {¶ 15} (6) Pastor Steven Anthony, church minister and manager of Genesis Dreamplex apartment where parents resided during 2005;
 {¶ 16} (7) Tonya K., foster mother for Tyler, Cody, and Ryan;
 {¶ 17} (8) Faye Lorenzo, Cody and Ryan's juvenile probation officer;
 {¶ 18} (9) Sherrie Twining, LCCS assessment caseworker, investigator of sexual abuse disclosure by Tyler pertaining to father in September 2004;
 {¶ 19} (10) Bridie Murphy, LCCS caseworker since August 2004;
 {¶ 20} (11) Deposition of Julie Jones, social worker associated with Mercy Children's Hospital and Dr. Schlievert, interviewer of Tyler for alleged child sexual abuse;
 {¶ 21} (12) Dan Weiss, court appointed guardian ad litem ("GAL").
 {¶ 22} In addition, the following relevant documents were admitted into evidence:
 {¶ 23} (1) Criminal record of Anthony C, father;
 {¶ 24} (2) September 2000 judgment entry from Wayne County, Michigan Juvenile Court, terminating mother's parental rights to previous children born in 1990 and 1991, based upon "serious psychiatric problems stemming from sexual abuse and neglect" and damage from "abuse and neglect which mother does not acknowledge or understand;" *Page 6 
 {¶ 25} (3) LCCS case notes; and
 {¶ 26} (4) Tyler's medical records.
 {¶ 27} Evidence and testimony presented by LCCS documented the reasons for Tyler's removal from his mother in 2003, Tyler's disclosure of sexual abuse by Ryan and his mother, Ryan's admission of sexual abuse of Tyler and the reasons for the cessation of visits with mother and father. Evidence was presented that Tyler revealed that before he was removed at the age of three and one-half years, his parents often fought to the point that he would tell them to "shut up" because they were keeping him awake and he needed to sleep. He also stated that father had choked him and physically abused him, his two half-brothers, and mother at times.
 {¶ 28} Tyler's foster mother also testified that he had been receiving counseling and medication for behavior issues, including ADHD and other mental health diagnoses. After the sexual abuse occurred, Tyler also exhibited acting out behaviors, including urinating and defecating in inappropriate household areas, such as bedrooms, the living room, and plants. He received short term treatment at the then Medical College of Ohio Kobacker Center, a treatment center for children with mental health issues. After his release, he continued in counseling and on medication. The foster mother stated that he was improving, but still required constant monitoring to help him with behavior issues.
 {¶ 29} Evidence was also presented to document mother's failure to engage in recommended substance abuse and psychological services, that one service became unavailable due to mother's lack of insurance, that mother tested "dirty" for illegal drugs *Page 7 
and later refused to submit to testing, and that mother had previously had parental rights involuntarily terminated in a Michigan court regarding two other children due to abuse and neglect. In addition, evidence was presented that father had attended and completed several case plan programs, including anger management and parenting classes, mental health and substance abuse group, domestic violence group, and minimal education about sexual abuse awareness. Counselors and treatment providers stated that father had initially cooperated and completed programs and acknowledged mother's drug abuse issues and his own substance abuse problem with alcohol. His behavior and later statements indicated that he did not, however, appreciate or understand these issues and what Tyler needed to be safe.
 {¶ 30} A security worker noted that, despite attending the substance abuse program for alcohol use, father was observed purchasing two 40 ounce beers at a local carryout. Father also continued to drive on a suspended license, resulting in a 50 day jail incarceration during the months just prior to the permanent custody hearing. Father also often permitted Cody, who would run away from his foster home, to stay in his home for several weeks before reporting or returning him to the agency.
 {¶ 31} Although father initially acknowledged Ryan's sexual abuse of Tyler, father later stated that he did not believe it had happened. In 2004, he claimed that the relationship with mother was over, because of her drug abuse. Despite LCCS's major concerns with domestic violence, substance abuse, and possible sexual abuse issues, however, the parents were married in mid 2005 and again resided together. Ryan, who *Page 8 
had perpetrated sexual abuse against Tyler, also returned to live with mother and father. Finally, both father and mother eventually stopped cooperating with drug screen requests, when LCCS had received information that drug or alcohol abuse continued.
 {¶ 32} Father's only witness in response to the agency's case was the GAL, Dan Weiss. The GAL acknowledged that Tyler often vacillated between wanting to remain with the foster mother and returning home. Weiss stated that he had serious concerns, however, regarding the parents' ability to protect Tyler or to appreciate the amount of treatment and counseling needed due to the past emotional, physical, and sexual abuse. Weiss noted that during the month just prior to the permanent custody hearing, Cody had twice run away from his foster home, returning to father and mother's residence. On one occasion, Cody was disruptive and barricaded himself in the apartment and had to be removed by police officers and EMT crews who responded to father's call for help. During Cody's most recent appearance at the home, an altercation developed, leaving mother (Cody's stepmother) with a broken arm.
 {¶ 33} The GAL also noted that he had grave concerns that Ryan, who had perpetrated sexual abuse on Tyler and was much older and bigger than Tyler, was living with father and mother. Weiss opined that Tyler would not thrive in the dysfunction and chaos of the family home because Tyler would be unable to feel safe and to continue to make progress in his mental health recovery. Weiss said that he recommended permanent custody to LCCS, but hoped that controlled, supervised contact with the parents could be arranged, since that was what Tyler wished. *Page 9 
 {¶ 34} Ultimately, the court found that Tyler could not or should not be returned to the parents and awarded permanent custody to LCCS as in Tyler's best interest. The court found numerous factors pursuant to R.C.2151.414(E) applied to both parents, in support of its decision.
 {¶ 35} Father and mother each now appeal from that decision. Father argues the following four assignments of error:
 {¶ 36} "A. The trial court erred in granting permanent custody to the agency as it failed to show by clear and convincing evidence that it is in the best interest of the minor child that permanent custody be awarded to Lucas County Children Services Board and they failed to prove by clear and convincing evidence Ohio Revised Code Sections2151.414(E)(1), (3), (4), (14), and (15).
 {¶ 37} "B. R.C. 2151.414(B)(1)(d) does not support an award of permanent custody of Tyler C. to the agency as it is unconstitutional on its face and as applied in the instant matter.
 {¶ 38} "C. The trial court erred in finding that permanent custody is in the best interest of Tyler pursuant to R.C. 2151.414(D).
 {¶ 39} "D. The trial court's `reasonable efforts' finding contained in the April 26, 2007 nunc pro tune [sic] is against the manifest weight of the evidence."
 {¶ 40} Mother sets forth the following two assignments of error:
 {¶ 41} "I. The trial court erred in relying on ORC 2151.414(B)(1)(d) as it is unconstitutional on its face and as applied to this case. *Page 10 
 {¶ 42} "II. The trial court's finding that the child could not or should not be placed with the appellant within a reasonable time was not supported by clear and convincing evidence."
 I. {¶ 43} We will address father's first and mother's second assignments of error together. In his first assignment of error, father claims that the trial court's findings that the factors under R.C. 2151.414(E)(1), (3), (4), (14), and (15) were not supported by clear and convincing evidence. In her second assignment of error, mother contends that the trial court's finding that Tyler could not or should not be placed with her within a reasonable time was not supported by clear and convincing evidence. In this case, the court found that the following factors were met pertaining to mother: R.C. 2151.414(E)(1), (2), (4), (14), (15) and (16).
 {¶ 44} In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414. R.C. 2151.414(E) provides, in pertinent part, that:
 {¶ 45} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised *Page 11 
Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 46} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 47} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of this section 2151.353 * * * of the Revised Code;
 {¶ 48} "(3) The parent committed any abuse as described in section2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in *Page 12 
section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 {¶ 49} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 50} "* * *
 {¶ 51} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 52} "(15) The parent has committed abuse as described in section2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
 {¶ 53} "(16) Any other factor the court considers relevant."
 {¶ 54} A trial court may base its decision that a child cannot or should not be placed with a parent within a reasonable time upon the existence of any one of the R.C. 2151.414(E) factors. Under the plain language of the statute, the existence of one factor *Page 13 
alone will support a finding that the child cannot be placed with the parent within a reasonable time. In addition, we note that R.C.2151.414(E) does not require that the child actually be deemed to have been "abused." Rather, it states that the court need only find certain factors exist, such as, that a "parent has committed abuse" or is "unwilling * * * to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."
 {¶ 55} In this case, testimony and evidence was presented that mother and father both refused to comply with drug screens on many occasions. Although drug screen results at the time of the permanent custody proceedings showed negative, no evidence was presented that mother and father had actually stayed clean throughout the time the agency was providing services. Without documentation that father and mother had not used drugs, any refusals to submit to tests must be deemed to be "positive."
 {¶ 56} The record shows that a real risk for domestic violence and physical or sexual abuse to Tyler also remained. Although father and mother may have attended programs to address these issues, again, testimony was presented that domestic violence continued to be a problem in the household. Cody's contact and presence in the household, including an attack that left mother (Cody's stepmother) with a broken arm, indicates that mother and father were unlikely to be able to protect Tyler from domestic violence and possible physical abuse. In addition, Ryan, who had not completed his sexual offender program, constituted a serious potential threat of harm to Tyler. Even *Page 14 
presuming mother had not committed any sexual abuse to Tyler, she had not attended any sexual abuse awareness education.
 {¶ 57} Moreover, even though father had some education regarding sexual abuse, by the time the permanent custody hearing was conducted, he had indicated to caseworkers and others that he no longer believed that Ryan had molested Tyler. Thus, despite Tyler's disclosure, his abuse indicative behavior, and Ryan's admissions, father was in denial that his older son had perpetrated sexual abuse on his younger son. The upheaval and violence in the home caused by Cody along with Tyler's young age and mental health instability, constituted a high risk for repeat sexual or physical abuse. Mother and father simply did not present any rebuttal evidence that they possessed the ability or awareness necessary to keep Tyler safe.
 {¶ 58} Therefore, upon consideration of all the evidence and testimony presented, with virtually no rebuttal by mother or father, we conclude that the trial court's findings under at least three factors for both mother and father, R.C. 2151.414(E)(1), (14), and (15), were supported by clear and convincing evidence.[2] Since any one of those factors alone would permit the court's finding that Tyler could not or should not be placed with father or mother within a reasonable time, we cannot say that the trial court erred in its finding. *Page 15 
 {¶ 59} Accordingly, father's first assignment of error and mother's second assignment of error are not well-taken.
 II. {¶ 60} In his third assignment of error, father claims that the trial court erred in finding that permanent custody is in the best interest of Tyler pursuant to R.C. 2151.414(D).
 {¶ 61} Pursuant to R.C. 2151.414(D), in determining the best interest of a child, the court shall consider all relevant factors, including but not limited to the following:
 {¶ 62} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 63} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 64} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ending on or after March 18, 1999;
 {¶ 65} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; * * *" *Page 16 
 {¶ 66} The record indicates that at the time LCCS filed for permanent custody, March 30, 2006, Tyler had been in the same foster placement since mid-December 2003, a period of over 26 months. Although his step-brother had molested Tyler while also placed in that foster home, the record indicates that the foster parents took immediate steps to protect Tyler from further occurrences and Ryan was removed. In addition, although Tyler had continued in treatment and had sporadic outbursts and behavior problems, his overall behavior and mental health was continuing to improve while in the foster parents' care. The foster mother has expressed interest in adopting Tyler, as well.
 {¶ 67} During an in camera interview, Tyler's first choice was to stay with his foster mother, but wanted to remain in contact with his biological parents. The GAL noted that throughout the case, Tyler's desire to stay with his foster mother was consistent, but he did waver from time to time. The guardian noted that, despite the dysfunction, domestic violence, drug and alcohol abuse, and physical abuse to the older half-brothers, Tyler's desire to maintain contact with his father and mother was understandable and not uncommon. The GAL, however, considered the biological family to present a high potential for harm to Tyler if he were to be immediately returned home or to have uncontrolled contact with the parents.
 {¶ 68} Tyler's mental health providers and caseworkers also opined that, in order to overcome the effects of father's abuse of the siblings and of Tyler himself, as well as to deal with the sexual abuse issues, Tyler needed a secure, stable, permanent placement. They also recommended that placement not be with mother or father since drug and *Page 17 
alcohol abuse was still at issue, and the continued domestic violence and turmoil in the biological family would be detrimental to Tyler.
 {¶ 69} Therefore, we conclude that the trial court considered the factors in R.C. 2151.414, and its determination that permanent custody to LCCS was in Tyler's best interest, was supported by the evidence presented.
 {¶ 70} Accordingly, father's third assignment of error is not well-taken.
 III. {¶ 71} In his fourth assignment of error, father contends that the trial court's "reasonable efforts" finding contained in the April 26, 2007 nunc pro tunc judgment entry is against the manifest weight of the evidence.
 {¶ 72} The "purpose of a nunc pro tunc order is to have the judgment of the court reflect its true action. The power to enter a judgment nunc pro tunc is restricted to placing upon the record evidence of judicial action which has actually been taken. * * * It does not extend beyond the power to make the journal entry speak the truth * * * and can be exercised only to supply omissions in the exercise of functions which are merely clerical. * * * It is not made to show what the court might or should have decided, or intended to decide, but what it actually did decide." McKay v. McKay (1985), 24 Ohio App.3d 74, 75. When a court improperly enters a purported nunc pro tunc judgment, that judgment or order is void. See Natl. Life Ins. Co. v. Kohn (1937), 133 Ohio St. 111, paragraph three of the syllabus; Quinones v. Botello, 6th Dist. No. S-03-016, 2004-Ohio-3162, ¶ 18. *Page 18 
 {¶ 73} In this case, the trial court's nunc pro tunc judgment entry, arguably, was improper, since it added substantive findings, rather than the mere correction of a clerical or typographical error. This error was harmless, however, since, even if the nunc pro tunc entry is void, the original judgment entry was sufficient.
 {¶ 74} There are two avenues by which an agency can obtain permanent custody of a child: (1) by requesting it in the abuse, neglect or dependency complaint or (2) by filing a motion under R.C. 2151.413 after obtaining temporary custody. When the agency first seeks temporary custody, and then later files a motion for permanent custody, there is no need for the court to make a "reasonable efforts" finding. The reason for this is that, while the agency has temporary custody, it must file case plans and reviews indicating what it has done to assist the parents, including recommendations for services, which services the parents have attended, and whether progress has been made toward the goal of family reunification. Since there is already a "history" in the record of the case, with "reasonable efforts" findings made along the way, there is no need for an additional "reasonable efforts" finding. Therefore, the juvenile court's exclusion or inclusion of such a finding in a permanent custody motion case is not error.
 {¶ 75} In this case, the trial court, at the request of LCCS, entered a nunc pro tunc judgment entry, apparently in the belief it needed to "correct" its first judgment entry which failed to make a "reasonable efforts" finding. Such a finding was not necessary in this case, since the agency's request for permanent custody came via a motion to change disposition, after the adjudication and an initial disposition of legal custody to mother. *Page 19 
Throughout the case, each time a case plan was filed, the court repeatedly found that LCCS had made reasonable efforts to prevent removal of the child. As a result, we conclude that, even presuming the nunc pro tunc entered was improper, it was harmless error, since its sole purpose was to add a finding that was not required. Therefore, father's argument is without merit.
 {¶ 76} Accordingly, father's fourth assignment of error is not well-taken.
 IV. {¶ 77} Finally, we will address father's second and mother's first assignments of error together. Both appellants argue that R.C.2151.414(B)(1)(d) does not support an award of permanent custody of Tyler to the agency, as it is unconstitutional on its face and as applied in the instant matter.
 {¶ 78} Some appellate courts have declined to address the constitutional argument raised by the parents on the basis of waiver. See, e.g., In re Roberts, 5th Dist. No. 04CA29, 2005-Ohio-2843, ¶ 15;In re Dailey, 10th Dist. No. 04AP-1346, 2005-Ohio-2196, ¶ 25 (one of several from the Tenth District); In re K., 8th Dist. No. 83410, 2004-Ohio-4629, ¶ 13; In re K. S., 9th Dist. No. 21913, 2004-Ohio-2660, ¶ 8-9; In re Stillman, 155 Ohio App.3d 333, 2003-Ohio-6228, ¶ 30
(recognizing that waiver does not prohibit an appellate court from considering a constitutional challenge to a statute, but declining to address the constitutional challenge to R.C. 2151.414(B)(1)(d)).
 {¶ 79} In this case, the parents failed to raise any constitutional issue regarding R.C. 2151.414 in the trial court. Because due process for termination of parental rights *Page 20 
presents a continuing concern, however, we will consider how the statute was applied under the facts of this case.
 {¶ 80} The right to raise one's own children is essential, specifically when considering due process and equal protection. In reCunningham (1979), 59 Ohio St.2d 100, 104-105. Although the best interests of the child are of paramount concern, "the concepts of `parental unfitness' and `best interests' of the child are not always unrelated issues, and very often a consideration of the former may enter into the analytical process of ascertaining the latter." Id. at 106.
 {¶ 81} R.C. 2151.414(B)(1)(d) provides, in pertinent part, that:
 {¶ 82} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 83} "a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 84} "* * *
 {¶ 85} "* * * *Page 21 
 {¶ 86} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 87} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."
 {¶ 88} The "12 of 22" provision set forth in R.C. 2151.413(D)(1) and2151.414(B)(1)(d) attempt to balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child. See In re K.G., 9th Dist. Nos. 03CA0066, 03CA0067, 03CA0068, 2004-Ohio-1421, ¶ 19. Through the "12 of 22" provision in the permanent-custody statutes, the legislature ensures that parents are given at least 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C.2151.414(B)(1)(d) grounds. Id. at ¶ 21; In re Workman, 4th Dist. No. 02CA574, 2003-Ohio-2220, ¶ 40.
 {¶ 89} In this case, although Tyler was adjudicated dependent on May 1, 2003, he was not removed from his mother's custody until December 10, 2003. Therefore, February 8, 2004, sixty days after his removal and placement in temporary custody, is the starting date to consider when applying R.C. 2151.414(B)(1). LCCS filed its motion for permanent custody on March 30, 2006, more than 25 months after Tyler was taken into *Page 22 
custody. Therefore, on its face, LCCS' motion for permanent custody was filed within the statutory time restraints, and met the "12 of 22" month requirement.
 {¶ 90} Nonetheless, both mother and father argue that the agency delayed proceedings so as to create an artificial running of the time required under R.C. 2151.414(B)(1)(d). Our review of the record shows that initially both parents attempted to attend recommended services, and were successful in completion of some of those services. Some evidence was presented that mother did not complete one of her services due to a lack of insurance. No evidence was presented, however, to show what efforts mother made to attend free substance abuse programs, such as AA. Father completed the recommended programs, but then back-tracked on his belief that Tyler was ever sexually abused, despite Tyler's severe acting out behaviors which indicated serious mental health issues. In addition, father's actions often demonstrated that, despite his completion of certain programs, he remained unable to grasp and apply the information he had learned.
 {¶ 91} Evidence was presented, however, that during the pendency of the proceedings, additional issues arose which affected Tyler's custody and what was in his best interest. Despite the completion of some services, the parents either were unable to appropriately apply the information or appreciate the seriousness of Tyler's condition and his needs. Other concerns remained unresolved, such as continuing issues regarding the parents' alleged substance abuse and denial of the sexual abuse by Ryan. In addition, the parents stopped cooperating with the agency, would not submit to drug screens, and, at one point, did not provide their address for several months, preventing contact by the *Page 23 
caseworker. The parents were, therefore, given more than 12 months within which to remedy the problems causing Tyler's removal before LCCS filed for permanent custody.
 {¶ 92} Moreover, although this court has expressed serious concern about the "12 of 22" provision, this case does not turn on the application of that statute. Even presuming arguendo that the delay was not caused by the parents, the court did not determine that permanent custody was warranted solely under R.C. 2151.414(B)(1)(d). The court made additional findings which also support the award of permanent custody under R.C. 2151.414(B)(1)(a). Since we have already determined that those findings were supported by the evidence presented, under the facts of this case, we cannot say that the trial court's application of R.C. 2151.414 was unconstitutional.
 {¶ 93} Accordingly, father's second assignment of error and mother's first assignment of error are not well-taken.
 {¶ 94} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4. *Page 24 
Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J., CONCUR.
[1] Ultimately, in April 2006, Ryan aged out of the system and was no longer under a case plan with LCCS.
[2] We also conclude that factors (2) and (16), as they pertain to mother, were supported by the evidence, but decline to discuss them further. *Page 1