DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Brandy Stahl-Welsh, appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, K.S., and placed the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court reverses.
 I. {¶ 2} Appellant and Timothy Dunn are the natural parents of K.S., born on February 2, 1998. Dunn's parental rights were also terminated and he is not a party to this appeal. After the birth of K.S., appellant married Daniel Welsh, and Welsh has been incorporated into these proceedings through case-planning.
 {¶ 3} CSB was initially involved with the family in July 2000 when K.S. was removed from the home as a neglected child. The case was resolved in late 2001 when K.S. was placed in the care of Liza Snyder, a maternal aunt, and an infant brother was placed with his father.
 {¶ 4} On March 1, 2002, CSB filed the complaint which forms the basis of the present action, and alleged that K.S. was abused, neglected, dependent and endangered. The affidavit asserted that, while in the care of Snyder, the child apparently swallowed Pine Sol, a cleaning fluid, and became unresponsive. At the hospital, the child was found to have bruises over her entire body. Tests revealed subdural hematoma, retinal hemorrhaging, and yielded a diagnosis of shaken baby.[1] The child was said to have a history of self-induced abuse and had reportedly attempted to drink other fluids not intended for human consumption. The police were notified, and K.S. was taken into custody pursuant to Juv.R. 6.
 {¶ 5} Snyder denied abusing the child, but relinquished custody at the shelter care hearing. She was dismissed as a party at that time. Appellant then moved to obtain custody of her child. Following hearings, the child was adjudicated abused and dependent, and was placed in the temporary custody of CSB.
 {¶ 6} In December 2002, CSB moved for permanent custody and, in April 2003, appellant moved for a six-month extension of temporary custody. Following a hearing on both motions and without opposition by CSB or the guardian ad litem, the trial court found that sufficient progress had been made on the case plan and granted a six-month extension.
 {¶ 7} In August 2003, appellant moved for a second six-month extension, and in September 2003, CSB again moved for permanent custody. On December 31, 2003, the trial court denied the motion for an extension, terminated the parental rights of appellant and placed the child in the permanent custody of CSB. This appeal followed. Appellant has assigned two errors for review.
 II. FIRST ASSIGNMENT OF ERROR
"R.C. 2151.414(B)(1)(d) Imposes a statutory presumption of parental unfitness if a trial court finds that a child has been in the temporary custody of csb for twelve or more months of a twenty-two month period and violates a parent's substantive and procedural due process rights as guaranteed under the ohio and united states constitutions."
 {¶ 8} Through this assignment of error, appellant challenges the constitutionality of R.C. 2151.414(B)(1)(d). She did not, however, assert this challenge in the trial court. Generally, an appellate court will not consider any error that could have been, but was not, called to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. State v. Childs (1968), 14 Ohio St.2d 56, paragraph three of the syllabus. The "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." State v. Awan (1986),22 Ohio St.3d 120, syllabus.
 {¶ 9} Because appellant did not raise this constitutional challenge below, this Court will not consider it now. The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR
"The trial court's award of permanent custody is not supported by sufficient credible evidence meeting the burden of clear and convincing evidence that permanent custody was in the best interest [of k.s.]."
 {¶ 10} Through this assignment of error, appellant has asserted that the trial court erred in concluding that there was clear and convincing evidence that permanent custody was in the best interest of the child This Court agrees.
 {¶ 11} Before a juvenile court can terminate parental rights and award permanent custody to a proper moving agency, it must find clear and convincing evidence of both portions of the permanent custody test as set forth in R.C. 2151.414(B). Specifically, the juvenile court must find: (1) that one of the factors in R.C. 2151.414(B)(1)(a)-(d) applies, and (2) that permanent custody is in the best interest of the child, pursuant to the factors set forth in R.C. 2151.414(D). See In re WilliamS. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will cause the trier of fact to develop a firm belief or conviction as to the facts sought to be established.Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 12} In the present case, the trial court found that the first prong of the permanent custody test was met by the fact that the child had been in the temporary custody of CSB for more than 12 months of the prior 22-month period. See R.C.2151.414(B)(1)(d). The trial court also found that permanent custody was in the best interest of the child. See R.C.2151.414(D). In this assignment of error, appellant has asserted that the evidence fails to support the conclusion of the trial court that permanent custody is in the best interest of the child.
 {¶ 13} In making the determination that the grant of permanent custody to the agency is in the child's best interest, the juvenile court was required to:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4)[2]
 {¶ 14} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, 2002-Ohio-34, at ¶ 6; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 15} The evidence before the trial court is summarized below. Witnesses were taken out of order at the hearing below, and are rearranged here for the sake of clarity.
 {¶ 16} Christina Snyder was the CSB caseworker assigned to the prior case involving K.S. The caseworker explained that the case plan objectives at that time were for appellant to: (1) attend parent education classes; (2) attend anger management classes; (3) seek mental health evaluations; (4) and obtain suitable housing. That case was terminated in November 2001 when K.S. was placed with a relative, Liza Snyder, and an infant son was placed with his father. The caseworker stated that appellant complied with the requirements of her case plan, but was not able to satisfy CSB as to her ability to interact with both children at the same time.
 {¶ 17} Eileen Kostich, of CSB's medically fragile unit, was assigned to the present case when K.S. was admitted to the hospital in February 2002. Kostich testified that although appellant was cooperative, she took a long time to get started on case plan objectives and then did not complete enough to reunify. Kostich stated that she still has no idea whether appellant would be able to appropriately parent her child due to the child's behavioral needs.
 {¶ 18} She explained that the case plan objectives in the present case required appellant to: (1) address K.S.'s behavioral and medical needs; (2) attend parent education classes; and (3) obtain a mental health evaluation. Mr. Welsh was required to obtain a mental health evaluation and attend anger management classes. Kostich stated that the case plan objectives regarding parenting classes, mental health assessments and anger management were completed. Later, because of a disparity between a mental health evaluation of appellant during the previous case and a more recent one, Kostich requested that another assessment be done at Catholic Social Services. That evaluation resulted in a recommendation for continued counseling.
 {¶ 19} Although appellant attended two sets of parenting classes, Kostich stated that there was little interaction between appellant and the child during the visitations she observed. The child actively played and appellant watched. Kostich conceded, however, that she has received no reports that appellant did not act appropriately in any of the supervised visits with K.S. Kostich transported the child to visitations and has not observed problems during transport. Nor, she stated, has the child expressed any fear or anger towards appellant during those transports.
 {¶ 20} Although Kostich stated that she tried to assist appellant in gaining insight and education regarding the needs of K.S., there was no evidence of any effort to provide her with specialized parenting classes for a special needs child — only general parenting classes with brief references to special needs children.
 {¶ 21} While Kostich complained that appellant did not request visits until "really late in the case," she also admitted she was not aware that appellant filed requests to be involved with medical providers and participate in visitation in April and July 2002, very early in these proceedings.
 {¶ 22} Kostich testified that she believed that permanent custody in CSB was in the best interest of the child because she needs a stable home and constant monitoring, and appellant and her husband are not able to provide that.
 {¶ 23} Kimberly Berger, the second foster mother, also testified. Berger explained that she and her husband provide care for their own 18-year-old and seven-year-old daughters, K.S. and a nine-month-old foster child. When K.S. came into Berger's care in April 2002, at the age of four, K.S. exhibited several problems, including self-destructive behavior, poor speech, terrible balance, and was developmentally delayed. These problems were addressed through occupational therapy, physical therapy, and speech therapy.
 {¶ 24} Weekly visitation with K.S.'s mother began in June 2002 at the visitation center. Berger did not deny that the child's treatment schedule was inconsistent, but explained that she had difficulty getting the child to appointments because of her work schedule. CSB then provided a driver for the child's appointments. The child continued to miss several appointments due to weather and traffic problems encountered by the CSB driver.
 {¶ 25} According to Berger's testimony, the child became angry and returned to her self-destructive behavior an hour or so after visits with her mother and for the next day or two. Recovery took progressively longer, and Berger decided to raised the issue with the caseworker, Eileen Kostich. Following consultation with Dr. John Duby, the visits were stopped. After four to six weeks, the child's behavior reportedly improved. According to Berger, when joint-counseling sessions between mother and child were begun in April or May 2003, the self-destructive behaviors returned.
 {¶ 26} Berger admitted that K.S. does not complain about seeing her mother or Mager. Also, her husband was told by the CSB transporter that K.S. became upset or cried when the visits were over and appellant was leaving her.
 {¶ 27} Berger stated that K.S. used to speak negatively about her aunt, indicating that she did not want to go back with her aunt because the aunt hurt her. K.S. does not mention her mother very much, except occasionally to ask if she is "ever going to see mommy again." Berger said no one ever suggested to her that she should participate in the joint-counseling sessions.
 {¶ 28} Dr. John Duby, director of developmental and behavioral pediatrics at Children's Hospital Medical Center, testified regarding his periodic evaluations of K.S. He initially saw the child for a behavioral evaluation in June 2001, while she was under the care of her maternal aunt. At that time, there were concerns regarding the child's intense temper tantrums, biting, hitting, kicking walls, throwing herself on the floor, and banging her head. K.S. was found to be a year behind in all developmental skills, but presented no signs of neurological disturbance.
 {¶ 29} Dr. Duby saw the child again, in February 2002, when she was in intensive care after suffering a subdural hematoma. Dr. Duby thought it unlikely that her injury was self-inflicted. K.S. had mild paralysis on the right side.
 {¶ 30} In August 2002, Kimberly Berger, the foster mother, brought the child to see Dr. Duby. He found that the child had made remarkable improvement in her neurological examination. She no longer had any weakness on her right side and also showed significant developmental progress. Berger was concerned, however, with deterioration in the child's behavioral functioning, including an increase in disruptive behavior, regression in toileting skills, and deterioration of sleep habits.
 {¶ 31} According to Berger, this behavioral deterioration coincided with joint-counseling visits between appellant and K.S. Dr. Duby understood Berger to say that the child's behavior deteriorated the day before anticipated visits with appellant and continued for a day or two afterwards. He relied solely on Berger for this information. He explained that the fact that the misbehavior began before the visits was central to any conclusion that the joint sessions with her mother were causing the misbehavior as opposed to a reaction to separation. In reliance on this information from Berger, Dr. Duby therefore recommended that CSB consider discontinuing K.S.'s visits with appellant. CSB did discontinue those visits in August 2003.
 {¶ 32} Whether or not Berger told Dr. Duby that the child's behavior deteriorated on the day before the visits, it is clear that Berger testified during the permanent custody hearing that the child's behavior did not deteriorate until after the visits.
 {¶ 33} By March 2003, Dr. Duby observed that K.S.'s behavior problems had improved remarkably, she continued to make developmental progress and the child's physical and neurological exams looked good. He considered it "vital" that K.S. continue to be in a stable, nurturing, predictable, structured environment. He stated that it appeared there had been significant improvement in her overall functioning when visits with appellant were terminated, but he could not be certain that the improvement was related to the termination of the visits with appellant.
 {¶ 34} Robin Tener, clinical psychologist, then testified regarding her assessment of K.S. in June and July 2002. She initially became involved because K.S. was demonstrating sexualized behavior, possible sexual victimization, and behavior problems.
 {¶ 35} She testified that K.S. reported that her aunt spanked her a lot, threw her in a toilet, and made vague references to sexual conduct by the aunt. She also reported negative feelings, confusion and distress about whatever contact she had with her mother. K.S. reportedly said, "My mom come over and beat my butt * * *." There was no further evidence regarding this statement.
 {¶ 36} At times, K.S. would say that she did not like her real mother, but other times she drew pictures for her and asked to see her. The bond between them seemed to vacillate between positive and negative. Tener believed that the child's visitation experience was causing her to feel insecure and anxious. Tener could not conclude whether the child was upset by contact with her mother or by the separation from her.
 {¶ 37} Robert Bell, psychotherapist for Summit County Catholic Social Services, also testified for CSB. He was asked by CSB to provide an opinion in regard to appellant's parenting skills and mental health evaluation. Bell understood that CSB wanted a second opinion because it believed appellant had more difficulties than an earlier assessment indicated.
 {¶ 38} Bell did not use any written tests available for determining personality disorders, and has not been trained in psychological testing, but relied on his own experience. The evaluation was conducted during four sessions in May and June 2003.
 {¶ 39} Bell testified that he believed appellant "is not 
fit to adequately parent her children. The basis for his opinion was that appellant has serious emotional and psychiatric disturbances that make her unable to parent, including a persistent pattern of poor judgments. Bell diagnosed six personality disorders, including: (1) borderline; (2) antisocial; (3) paranoid; (4) narcissistic; (5) not otherwise specified; and (6) passive aggressive.
 {¶ 40} He stated that the one characteristic that runs through all these disorders is lying and fabrication. He believed appellant did a lot of lying. The example he provided is that, on one occasion, appellant stated that she had previous counseling at the age of seven, whereas on another occasion, she indicated that she had counseling at the age of 14. Appellant stated during her own testimony that she had counseling from the age of seven until the age of 14.
 {¶ 41} In addition, Bell "absolutely" believed appellant was serious when she said she would like to have 24 children, and this statement contributed to his opinion. Appellant testified that she would, indeed, like to have many children, but that she was joking when she made that statement. She said she and Mr. Welsh would not be having any more children because he was unable to father children.
 {¶ 42} Bell also stated that appellant is very impulsive in her decision making. He believed appellant makes poor judgments and that she would overestimate her abilities or the child's abilities. He believed appellant would have difficulty bonding with her child, would be a poor role model for her child, and would not be able to teach her daily life skills.
 {¶ 43} Bell also met with Mr. Welsh. Although he stated that he was not prepared to discuss Mr. Welsh, he nevertheless went ahead and did so. He stated that he did no intellectual testing, but suspects he is probably below average in IQ. Mr. Welsh has no child-rearing experience and Bell believed he would be easily led. He did not believe Mr. Welsh is capable of being a primary or joint caretaker of the child.
 {¶ 44} Sheri Walters, an employee at Portage Path Behavioral Health Center, provided individual counseling to appellant for the past year. Appellant came to her with a diagnosis of "phase of life problem," i.e., a change in life that creates stress. Appellant's goal was to work on her case plan and regain custody of her child. She attended very regularly and cancelled only once because of a house fire. She was extremely cooperative and always very pleasant. Her affect was appropriate. She was frustrated at times, but never defensive.
 {¶ 45} When apprised of Bell's diagnoses, Walters expressed her disagreement. She said that she had not observed any actions by appellant during her sessions that would lead to those diagnoses, and believed that appellant demonstrated rather good problem solving.
 {¶ 46} Florence Wavle, K.S.'s 2003-2004 classroom teacher and an early intervention specialist, testified at the permanent custody hearing. She stated that K.S. is doing fine academically, but her behavior is erratic. The teacher explained that she charts the children's behavior on a scale: first warning, second warning, loss of privileges, and telephone call home. K.S.'s current behavior usually requires only a first or second warning. Occasionally, her behavior has been worse, Wavle said, and requires a loss of privileges, but that occurred more at the beginning of the school year. Similarly, according to Wavle, K.S. has wet herself and engaged in self-destructive behavior less in the past couple weeks.
 {¶ 47} When asked if any of the child's erratic behaviors coincided with her joint-counseling sessions with her mother, Wavle stated that K.S. would often be flighty, jumpy, and hard to settle down when she returned, but there were no major outbursts.
 {¶ 48} Wavle testified that K.S. is just beginning to be able to put her feelings into words. Recently, K.S. said she was going to see her mother and that her mother was going to ask the judge if she could come live with her. Wavle stated that K.S.'s behaviors are manageable in a special education classroom, and that Wavle's special training is necessary to deal with the issues that K.S. has.
 {¶ 49} Shawn Blake, counseled Mr. Welsh following a referral by CSB. His primary diagnosis was a phonological disorder, a problem with speech and hearing. He was referred to Blake for anger management counseling. According to Blake, Welsh seemed to have skills and knowledge about anger management and maintaining his temper. Welsh was discharged in June 2003, because Blake was comfortable that anger was not a major problem for him. Blake also addressed a history of depressive symptoms and impulse control problems from a previous admission. At the time of discharge, Blake had no remaining concern about any of those issues. There was nothing that led Blake to believe that Welsh could not co-parent a child. According to Blake, Welsh appeared to have an understanding of his role and a willingness to undertake it.
 {¶ 50} Catherine Neelon monitored the recent visits of appellant and K.S. at the visitation center. She testified that, at first, she had to suggest to appellant that she could bring healthy snacks or dinner for K.S. Thereafter, appellant usually brought dinner and some toys — her favorite dolls and a new microwave toy that she likes. It takes K.S. one-half hour to eat her dinner. Appellant talks with her while she eats, and then K.S. typically plays on her own while appellant watches her. According to Neelon, there is not much interaction. Occasionally, appellant plays ball on the floor with her daughter or helps her put toys away.
 {¶ 51} Neelon stated that appellant tells K.S. she loves her and gives her hugs.[3] Appellant does not say anything to K.S. that concerns Neelon. Appellant asks how she did in school and what she has been doing. There is not a lot of conversation, however.
 {¶ 52} Neelon testified that during the visits, K.S. has expressed a desire to go home with appellant. She is happy to see her mother, and mother is happy to see her. Appellant has not missed any sessions while Neelon has monitored them. The only time K.S. was upset was two weeks earlier, when she started crying because she said she missed her mother. K.S. does tend to wet herself frequently, and Neelon has to ask her if she needs to go to the bathroom.
 {¶ 53} When Neelon picks her up from the foster home, the child comes out herself and seems happy to leave the house. On the ride back to the foster home after visits, she always says she had a nice visit.
 {¶ 54} Neelon stated that three or four weeks ago, K.S.'s lip was cracked, with dried blood on it. Appellant asked her what happened and K.S. said her foster mother hit her. Upon inquiry, the foster mother said that K.S. tripped on a baby toy. Neelon also observed bruises on the child's inner thigh on one occasion.
 {¶ 55} Gail Mager, a psychologist and clinical counselor at Northeast Ohio Behavioral Health, also testified. Mager began counseling K.S. alone in August 2002, following an assessment by Robin Tener. The child's attendance was sporadic because of difficulties of the foster mother and the CSB transport person to get her to the sessions. In addition, the foster mother was less than cooperative and that contributed to slow progress.
 {¶ 56} Mager also counseled appellant alone, with her husband, and jointly with K.S. The joint-counseling sessions have taken place weekly since April 2003. Mager believed that the only way to see how the parent-child relationship may blend is to see them together. Out of 15 or 16 scheduled sessions, six were cancelled by CSB, one by Mager, and none by appellant. CSB failed to notify appellant of three of their cancellations. Appellant made a "great effort" to be there, and was "very eager." Mager stated: "It was her desire to have joint sessions with her [daughter] and disappointed when K.S. wasn't there to meet her."
 {¶ 57} On September 10, 2003, Mager recommended supervised visitation outside the therapeutic setting to the caseworker, with possible extended visits. She based her recommendation on the fact that mother and daughter were doing very well, K.S. was not afraid, and was very comfortable with her mother.
 {¶ 58} Mager stated that the joint-counseling sessions have gone "very well." She explained: "They are getting to know each other again and getting to understand each other's place developmentally." Mager stated that the sessions have little structure, and K.S. draws appellant into play. No serious concerns were raised by their activities or interaction. There appears to be a bond between them. K.S. knows appellant to be her mother and looks to her as her mother. K.S. can be defiant and strong-willed, but never acted-out while her mother was there. Mr. Welsh attended two of the sessions, and Mager would be happy to have him continue, but CSB refused to allow "other family members" to participate. When he was present, K.S. interacted appropriately with him and initiated interaction with him.
 {¶ 59} Mager believed K.S. looks forward to seeing her mother. K.S. has never indicated that she did not want to visit, and in fact, was disappointed — and acted-out — on the one occasion that her mother was not present due to a scheduling error. She has never expressed any fear of her mother. K.S.'s communication with Mager has improved significantly since appellant started having joint sessions.
 {¶ 60} Before the joint sessions, K.S. was very anxious and angry, whereas since the joint sessions with mother, she has begun to open up more and express some of her feelings. She has become much happier and much more eager to come in. She is a different child in her posture and the way she presents herself. Mager believed that the reason K.S. finally progressed is because of reengagement in a relationship with her mother.
 {¶ 61} In the joint sessions, K.S. has expressed her feelings through interactive play with her mother, such as with puppets. Mager also provides some parenting education and talks with appellant about K.S.'s problems. Mager discusses how appellant might address K.S.'s academic needs and how to succeed in school.
 {¶ 62} Mager stated that the foster parents have been less than cooperative in encouraging joint-counseling. For example, the foster mother called at one point to say K.S. would not be able to participate until a certain date because of her work schedule, but K.S. did not participate even then. Mager spoke to the foster mother again in February 2003 and "[foster mother] said she didn't see why it would be important for [K.S.] to participate as [she] would probably be going into permanent custody and going to a new home as of the April hearing."[4]
 {¶ 63} Mager testified that K.S. volunteered that she was told by the foster mother that "mommy doesn't love her, that mommy is mean to her." K.S. also expressed that she is reticent to see her biological mother because "it would hurt" her foster mother. K.S. reportedly told Mager that if she sees her mother, her foster mother will get mad.
 {¶ 64} Mager indicated that she believed these statements by K.S. were credible because they were repeated, unsolicited, over the course of a year. Mager also stated that K.S. had never volunteered anything nice about the foster home, foster mother, or foster sister.
 {¶ 65} When Mager asked K.S. why she gets angry and pulls her hair out, K.S. replied that she gets angry because Katie, another child in the foster home, tells her what to do. K.S. also admitted to Mager that she wets herself to make her foster mother mad. Mager concluded that K.S. feels frustrated, powerless, and is not happy in the foster home. She believes K.S. would have made more progress if she had a foster parent who was involved in the counseling process. Mager stated that she made that request through caseworker Kostich and in calls made directly to the foster home.
 {¶ 66} Mager explained that appellant exhibited parenting skills during the joint-counseling sessions. For example, appellant talked to the child about not breaking her glasses in anger again, about listening to her teacher, and handling her feelings if she gets upset with the teacher. Appellant told Mager that if she were to get K.S. back in her home, she would contact the child's teacher to know what she can do to help K.S. in school and improve her behavior.
 {¶ 67} Mager hypothesized that if K.S.'s behaviors after the joint-counseling sessions were related to seeing her mother, then you might expect that she would not want to see her mother and to have to drag her into the room. To the contrary, K.S. exhibited no anxiety in contact with her mother. In addition, one would expect that the acting out in school would have reduced when visits were terminated, but instead, they were reportedly worse.
 {¶ 68} Mager stated that despite their separation, K.S. does know her mother, and it would impact the child negatively if her mother were permanently removed from her life. Mager said that if permanent custody were granted to CSB, it would be very difficult for K.S. because it's been an on-again, off-again relationship and she does not understand Mager believed that it would be contrary to the child's best interest to terminate parental rights.
 {¶ 69} Appellant then testified in her own behalf. She testified that K.S. was not in her care in February 2002 when the child was injured and taken to the hospital. During the period when K.S. was in Snyder's custody, appellant was only permitted to visit two hours weekly. Appellant described her relationship with K.S. at that time as loving, affectionate, and playful. She also said that K.S. obeyed her instructions.
 {¶ 70} During those visitations, appellant observed Ashley, Snyder's child, taking toys from K.S. and hitting her. Appellant requested more visitation, but it was refused. On Christmas Eve 2002, Snyder refused to let appellant visit any longer, claiming appellant was complicating her life. During the visit on that day, appellant noticed that K.S. was acting strangely and as if she were afraid to talk to her. Shortly thereafter, in January 2003, the maternal grandmother saw K.S. with Snyder at a fast food restaurant where maternal grandmother worked. The left side of K.S.'s face was bruised. The maternal grandmother and the store manager asked how it happened. K.S. said Snyder hit her because K.S. called her Lisa. The store manager reportedly called CSB.
 {¶ 71} Appellant was notified when K.S. was taken to the hospital in February 2002, but was not allowed to visit her until June or July. In April or May 2002, appellant asked caseworker Kostich to be involved in visitation. On July 12, 2002, her attorney filed a motion to include appellant in counseling and medical appointments. CSB allowed visitation, but no involvement in medical appointments or counseling. However, after five visits, on August 5, 2002, visitation was terminated.
 {¶ 72} Appellant testified that she took two sets of parenting classes, two sets of anger management classes, and has been married for three and one-half years. Her husband also took parenting classes and anger management classes. Appellant attended all the hearings in this proceeding.
 {¶ 73} Appellant has three part-time jobs. She works for a temporary agency three days a week, baby-sits six children for relatives in the late afternoons, and works weekend evenings at a seasonal job at Blossom Music Center. The children she baby-sits range in age from four to twelve, and include two who are in "SBH" classes, two with asthma, and one with a learning disability.
 {¶ 74} Appellant described her current relationship with K.S. as very good and stated that she loves her very much. K.S. calls her "mommy" and calls Mr. Welsh, "daddy." Appellant stated that the counselor posed hypotheticals during the joint-counseling sessions. In regard to discipline, appellant explained that she would use time-outs or remove a toy or privilege. If the child attempted to hurt herself, appellant stated that she would restrain her "in a loving way." She described the activity in the joint-counseling sessions as follows:
"We play, we talk, I teach her things, I tell her how to handle her anger, I give her examples. I explain to her slowly and at like her age level so she can comprehend it. * * * She seems to listen and take it all in like she understands it, and when I get done talking to her, I ask her if she understands and I ask her to repeat it back to me to make sure she understands."
 {¶ 75} Appellant explained that K.S. never hurt herself in her presence. During the first three or four sessions, K.S. would get upset when it was time to clean up and go. Appellant told her that if she goes home and behaves, she will see her again. Appellant testified that she tried to speak to the foster mother once and ask questions, but the foster mother ignored her.
 {¶ 76} Appellant testified that her daughter seemed excited and happy to have her husband participate with them in the joint-counseling sessions. However, after the second visit, appellant received a letter from caseworker Kostich stating that she was not permitted to have other family members participate.
 {¶ 77} Appellant stated she understands K.S. is a slow-learner, has speech problems, that there is deterioration in her eyes, and is supposedly abusive to herself, but her goal is to see her child succeed and get on the track of a normal five-year-old. When asked on cross-examination whether she thought K.S. would ever be "normal," appellant replied:
"She'll never be physically normal, but she could present herself as an average child, well-behaved. She probably will be able to speak better, read better. I mean, she'll act like a normal child, but she'll still have her mental and physical health that would be taken care of every day."
 {¶ 78} When visitation was terminated in the present case, appellant asked to have a telephone number or address so that she could communicate with her child, but Kostich told her she was not permitted to have that information. Kostich also refused to provide appellant's phone number to the child or to the foster home. Appellant said that Kostich did not offer to take cards or gifts to the child.
 {¶ 79} The two sets of parenting classes that appellant attended only briefly addressed special needs children. There is no evidence that CSB referred appellant to any parenting classes that would focus more on the particular needs of this child. Appellant did indicate that she had experience with handicapped children when she attended "SBH" classes. She also helped disabled children when she was in high school.
 {¶ 80} Appellant said that she has a separate room for the child, as well as furniture for the room. She explained that she has a bed, bed linens, two dressers, a desk, a night stand, and a lamp with a nightlight. Appellant said she would keep the child in her present school and would continue counseling with Gail Mager.
 {¶ 81} Appellant also has a son, who is in the custody of his father. The father does not permit appellant any visitation and she has no contact with him. The maternal grandmother and appellant's sister also previously had contact with K.S.
 {¶ 82} Finally, the guardian ad litem addressed the court. He indicated that appellant worked well with the counselor and did everything she could to visit K.S., given her opportunities. The guardian ad litem observed one visitation and noted that K.S. looked like she was enjoying herself. He never saw K.S. act inappropriately in the presence of her mother, act like she was afraid of her, or not be interested in her.
 {¶ 83} The guardian ad litem did express several concerns, however. The concerns included: (1) it took appellant a long time to find another place to live after her home burned down; (2) she seemed overwhelmed by working part-time and attending counseling once a week; (3) it took her a long time to initiate some of the evaluations; and (4) visitation seemed lacking in interaction — even after two sets of parenting classes.
 {¶ 84} In response, appellant's attorney pointed out that visitation was suspended by CSB for awhile; that the assessments were delayed because of appellant's motion seeking financial assistance; and that joint-counseling was inconsistent because the foster parents had been uncooperative.
 {¶ 85} In the end, the guardian ad litem recommended that permanent custody be granted to CSB. However, his opinion relied largely on the foster mother's claim that the behavior of K.S. deteriorated when she started visiting with her mother again, and his understanding that the child's teacher purportedly stated that the child had regressed to her earlier behaviors.
 {¶ 86} This conclusion therefore rests on uneasy ground. The foster mother testified that the child's behavior was poorafter visits, and Dr. Duby expressed his expert view that misbehavior in anticipation of visits was key to discounting separation as a cause of the child's misbehavior. Also, the child's current teacher testified in the permanent custody hearing that the child's behavior has improved, and not regressed, in recent weeks while joint-counseling sessions have taken place.
 {¶ 87} This evidence is considered in light of the four parts of the best interest test set forth in R.C. 2151.414(D).
1. The interaction and interrelationship of the child.
 {¶ 88} Unfortunately, there was a great deal of delay and failure of communication between the parties involved in this case. Many visitations were missed because of the employment of the foster mother and delay in making other arrangements. The caseworker was apparently not aware of appellant's early request to be involved in visitation, school, and medical appointments of her daughter. The counselor and appellant both stated that they requested that the foster mother be involved in joint-counseling sessions, but the foster mother indicated that she never received such a request.
 {¶ 89} Visitation, which is critical to maintaining and developing relationships, was terminated for reasons which now appear to be ill-conceived. The most significant criticism of the visitations between mother and child is a lack of interaction. Even caseworker Kostich conceded that the lack of visitation limited appellant's ability to interact and develop a relationship with the child. Notwithstanding these difficulties, the mother and child have maintained their relationship. In addition, the child also appears to enjoy her relationship with appellant's husband
2. The wishes of the child.
 {¶ 90} The child was five and one-half years old at the time of the hearing, but did not directly express her wishes at the proceedings. The guardian ad litem expressed his view that permanent custody was in the best interest of the child. However, as explained above, the guardian ad litem's opinion was based, in large part, on a questionable foundation.
3. The custodial history of the child.
 {¶ 91} K.S. was born in February 1998. She was placed in the temporary custody of CSB from May 2000 to November 2001, and legal custody was awarded to Liza Snyder in November 2001. Appellant had visitation until Christmas Eve, 2001. In February 2002, CSB regained custody due to abuse in Snyder's home. After a stay in the hospital, K.S. had a brief stay in one foster home, and in May 2002, she was placed in foster care with the Bergers. Visitation with appellant began in June 2002 and was terminated in August 2002. Joint counseling was initiated in April 2003 and the counselor recommended the resumption of additional visitation in September 2003.
 {¶ 92} This Court has indicated that "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on this child." In re Smith (Jan. 2, 2002), 9th Dist. No. 20711. In this case, much of the delay and time spent without visitation can be attributed to CSB and a lack of cooperation by the foster family. Moreover, despite the length of time that the child has been out of the appellant's care, the child continues to be anxious to see her mother, is happy to see her, and inquires when she might be able to live with her mother. The counselor indicated that a bond exists between mother and child, and appellant has stated that she loves the child and wants to be reunited with her. There was no evidence that the separation had any adverse effect on the relationship of the two or on appellant's ability to parent the child.
 {¶ 93} Moreover, none of the professionals could testify that appellant's visitation was the cause of any of K.S.'s behavioral tantrums. Only Dr. Duby indicated it might be a cause and, in so doing, he relied on the foster mother's supposed information that the child began acting-out the day before, as opposed to onlyafter, visits with the mother. In her testimony to the trial court, Berger clearly indicated that the tantrums occurredafter visits with her mother. This distinction was important to Dr. Duby's reasoning, as explained above.
4. The child's need for a legally secure permanent placement.
 {¶ 94} Caseworker Kostich stated her belief that permanent custody in CSB is in the best interest of the child, because she needs a stable home and constant monitoring, and because appellant and her husband are not able to provide that. However, Kostich also reported that the current caregiver is not interested in adopting the child and a permanent home has not yet been located. The caseworker admitted that K.S. may be difficult to place because she is a special needs child.
 {¶ 95} Dr. Duby, the guardian ad litem, and Robert Bell, all expressed the view that permanent custody is in the best interest of the child. However, as explained above, the views of Dr. Duby and the guardian ad litem are based, at least in part, on questionable foundations. Bell's opinion must be considered in light of the fact that he understood CSB to be inviting him to provide an opinion contrary to an opinion which was favorable to appellant.
 {¶ 96} On the other hand, the clinical counselor who spent the greatest amount of time working with the child and mother, Gail Mager, believed that the termination of parental rights would be harmful to the child. Mager stated that since the child has been participating in joint counseling, she has become happier and finally made progress, that there is a bond between appellant and child, and that appellant exhibited parenting skills during the sessions. In addition, appellant's individual counselor, Sheri Walters, disagreed with the diagnoses of Robert Bell regarding personality disorders. She found appellant to be cooperative, pleasant, and believed that she demonstrated good problem solving skills.
 {¶ 97} This Court has carefully considered the evidence presented upon the question before us. Cases involving the termination of parental rights are, by nature, difficult and of critical importance. This case is particularly difficult because of the conflicting and — in some cases — problematic — opinions expressed by the witnesses, the needs of the child, and the limited opportunity of appellant to demonstrate her ability to provide care for the child. But the termination of parental rights requires clear and convincing evidence that it is in the best interest of the child. This Court is convinced that such a conclusion has not been sufficiently supported by clear and convincing evidence in the present case. Based upon the record before this Court, this Court concludes that appellant's second assignment of error is sustained.
 III. {¶ 98} Appellant's first assignment of error is overruled. Her second assignment of error is sustained. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and the cause remanded.
Judgment reversed, and the cause remanded.
Baird, J., Slaby, J. concur.
[1] It remains unknown who was involved in these injuries to K.S. and no arrests have been made in regard to them.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.
[3] This is in contrast to the testimony of caseworker Kostich who testified of little emotional interaction between mother and child during the visits she observed. The record does not indicate, however, when those visits took place, whereas, the visitations monitored by Neelon are the most recent visits.
[4] A similar attitude — not seemingly directed to a goal of reunification — was reflected by the CSB attorney when she cross-examined Mager. Mager had indicated that she believed her role during joint-counseling was "to facilitate a relationship between mom and the child." The CSB attorney then asked: "Did it ever occur to you that your role may have been to monitor the interaction and not necessarily facilitate?" Mager explained that she did both, monitor and facilitate.