OPINION
{¶ 1} Appellant Angel R. [the mother] appeals the decision of the Belmont County Juvenile Court which terminated her parental rights and granted permanent custody of her daughter to appellee the Belmont County Department of Job and Family Services [DJFS]. The first issue on appeal concerns whether the father was served with notice of the permanent custody hearing and the effect of any lack of notice on the mother's appeal. The second issue is whether the governing statute is unconstitutional because it does not require a specific finding of unfitness in cases where the child has been in temporary custody for twelve or more months out of a consecutive twenty-two month period. The third issue is whether the court's decision on best interests is against the manifest weight of the evidence. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} In February 2004, DJFS filed a complaint against the mother, which alleged that her fourteen-month old daughter was a dependent child. DJFS was concerned with the mother's excessive internet use, poor housekeeping, record of evictions and lack of supervision over the child. On March 19, 2004, the child was removed from the home due to further allegations of unsanitary conditions and the mother's inability to meet the child's basic needs. The mother agreed to emergency shelter care placement of this child and her two older half-siblings. The adjudicatory hearing commenced on April 14, 2004, where the mother stipulated to the allegations in the complaint. The hearing was continued so the father, Michael M., could obtain legal representation. At the continued adjudicatory hearing on May 14, 2004, however, the father failed to appear. Temporary custody was then granted to DJFS.
 {¶ 3} DJFS worked with the mother to improve her situation. For instance, they assisted her in obtaining stable housing by negotiating with the apartment manager and paying her deposit and some rent. DJFS employees did twenty-eight loads of laundry at one time for the mother. They provided cleaning supplies, furniture, food vouchers and transportation. The mother obtained a psychological *Page 3 
evaluation and was diagnosed with major depressive disorder and adult attention deficit disorder. She attended counseling and started taking Zoloft for depression and Strattera for attention deficient. The two older children were placed with their father for custody purposes in order to decrease the mother's responsibilities.
 {¶ 4} On July 11, 2005, the child at issue was returned to the mother. DJFS formally asked the court to terminate temporary custody, disclosing that the mother successfully completed the case plan and could meet the needs of the child. Temporary custody was thus terminated. Still, DJFS continued to provide preventative in-home services.
 {¶ 5} Based upon their determination that the mother reverted to her old habits regarding housekeeping, supervision and internet use, they filed a new complaint alleging that the child, now nearly three years old, was neglected. The adjudicatory hearing proceeded on January 27, 2006. The father did not appear at any time in this new case. The mother stipulated to the allegations of the complaint, and the court found the child to be dependent. However, the child remained with the mother, and DJFS was given the right to conduct protective supervision visits.
 {¶ 6} Most times that DJFS arrived at the home to exercise their supervisory powers, they found a messy home and a dirty child wearing off-season clothing due to the lack of clean laundry. On April 20, 2006, photographs were taken. In general, these photographs depicted a very messy and cluttered apartment. For instance, dirty clothes were piled high in the bathroom, scattered in the living room and covered portions of the child's room including the bed. One mattress in the child's room was draped in loose plastic with no covering sheets, and another mattress was saturated with urine. A box fan had been knocked over in the child's room, which the mother stated she was using to air out the urine smell. Open black plastic garbage bags are visible on the floor of the child's room as is a fairly large hammer.
 {¶ 7} The kitchen counters were stacked high with what appeared to be weeks' worth of dirty dishes and pans. The refrigerator had hardening cheese sitting out of its plastic bags. The cabinet under the kitchen sink contained cleaning supplies and had no child-lock. Other cleaning supplies including ammonia were sitting within reach of the child as was an ashtray with cigarette butts. The child's training chair *Page 4 
contained urine with traces of feces smeared around the bowl. The mother's prescription medication was within the child's reach; although some pills were in child-resistant containers, a week's worth was in a snap-top pill dispenser. Chloraseptic throat spray and hydrogen peroxide were also sitting on the desk in the living room, and sewing needles were in a package of thread on the living room coffee table.
 {¶ 8} The mother was instructed that she had five days to clean up her home and secure the hazards to avoid removal of the child. In fact, she had been repeatedly advised about ashtrays, cleaning supplies and appliances. DJFS returned on April 25, 2006 only to find the same deplorable conditions. More photographs were taken demonstrating that the mother performed no tasks except to throw out the hard cheese. For instance, the cleaning supplies, ashtray and medication were still within reach of the child. Stacks of dirty dishes and pans still covered the counters. Left over meat sat on a cookie sheet on the edge of the sink. Chicken was thawing at room temperature. Three bags full of garbage were on the kitchen floor.
 {¶ 9} Additionally, all the dirty clothes remained in their piles; there were even clothes in the bathtub causing concern that the child had not been bathed recently. The training chair contained feces and what appeared to be more than one episode of urine. The mattress was still soaked with urine, and now, a window was open to air out the room. This open window with no screen created a serious falling risk since the bunk bed was adjacent to a two-story drop. The child's room now had an unknown red substance smeared on the wall. Crayon drawings could be seen over large portions of the walls. Two severe electrocution risks were discovered: a hairdryer was plugged in and left next to the sink and toilet; and, a lamp was plugged in with no bulb or shade.
 {¶ 10} Thus, the child was removed. Emergency shelter care was granted to DJFS after an emergency hearing. DJFS then filed a motion for temporary custody. The mother stipulated to the allegations. On June 16, 2006, the court granted temporary custody to DJFS.
 {¶ 11} On July 25, 2006, DJFS filed a motion for permanent custody. The hearing on that motion commenced on September 5, 2006. At the hearing, the mother's counselor estimated that the mother spends four hours per day online, which *Page 5 
she opined verged on addiction. (Tr. 15). She voiced concern with the mother's internet dating. (Tr. 14). The counselor noted that the mother had to kick one man out of the apartment after he came to visit and was physically abusive toward her. (Tr. 16-17). She expressed her personal belief that the more men the mother meets and invites home, the more she puts her child at risk. (Tr. 21). The counselor stated that the mother puts her needs over those of her children and rarely mentions her children at their sessions. (Tr. 15). She claimed that the mother does not understand the appropriate level of care required to be a full-time parent. (Tr. 31). The counselor concluded that, although she never saw the mother interact with the child, she agreed with the decision to seek permanent custody. (Tr. 21, 29).
 {¶ 12} A social services aide from DJFS explained the history of the case. She revealed certain dangers and unsanitary conditions existing over the years. She pointed out that she once made lists for the mother describing what chores needed to be performed. (Tr. 45-46). She referred to the mother's three different internet dates who stayed at the apartment with disdain. (Tr. 49). She noted that the mother allowed the boyfriend of her fourteen-year-old daughter to stay at the apartment. (Tr. 47). She identified pictures taken a few days before the hearing in order to establish that the mother has not changed and that she could not keep a safe and sanitary house even when there were no children to clean up after. The social services aide opined that the mother was not capable of sustained improvement and that it was not in the child's best interests to be returned to the mother. (Tr. 56).
 {¶ 13} The case manager's testimony also condemned the mother for inviting three men into her home. (Tr. 76-77, 97-99). Besides the problems expressed through viewing the pictures taken before and at removal, she added that she has witnessed bowls of moldy food in the living room and molding garbage. (Tr. 82). She expressed concern with toys stacked precariously into a closet that also contained a plastic bag. She revealed that the child's half-sister was providing the majority of the child's care prior to the first case. Thus, they instructed the mother to discontinue leaving the child under the sister's supervision; however, after the child's return, the mother refused to abide by this instruction. (Tr. 102). The case manager concluded that multiple removals and returns are extremely harmful to the child. (Tr. 85). She *Page 6 
noted that the child has been expressing unusual amounts of rage. She also disclosed for the first time that the child recently revealed allegations of sexual abuse. (Tr. 80).
 {¶ 14} The hearing was continued until September 19, 2006. A counselor with a doctorate in marriage and family therapy testified that she had so far met with the child two times. The child (now three months short of her fourth birthday) was referred for counseling just weeks before due to tantrums, cussing and threats to cut herself. (Tr. 152). At the first meeting, the child spontaneously revealed sexual abuse by her twelve-year-old half-brother. Specifically, she said that he "put it" in her mouth and "butt," which actually referred to her vaginal area. (Tr. 140). The child told her foster mother that her brother "shot her in the butt" and that he put cream on her privates. (Tr. 146).
 {¶ 15} The child also disclosed nightmares about monsters, her mother and her two half-siblings. The child said that her sister told her that the boogieman was real and that he killed a baby outside of her house which made her afraid of her house. (Tr. 147). The child stated that she did not like her mother's male friends and explained that she was not with her mother because her mother was on the computer instead of taking care of her and feeding her lunch. (Tr. 143, 147). It was pointed out that the child was potty-trained the first time she was in foster care but has now reverted to wetting and defecating in her pants during the day. (Tr. 145). The counselor diagnosed the child with post-traumatic stress disorder. (Tr. 139). The counselor concluded that the child should be awarded to the state, opining that repeated removals are more traumatic than the final ending. (Tr. 153, 172).
 {¶ 16} The mother testified that she lacks energy and motivation. She claimed that she would soon improve because a friend recently made her a list of daily chores in order to provide her with clearer and more specific directions. She stated that she reverted to her poor housekeeping because her older children started living with her again. She then said she would tell them they cannot come to her house anymore. (Tr. 216). Yet, she later said she was looking for a larger apartment for all of her children. (Tr. 227). She conceded that the original concern about her computer use was true but insisted that she no longer used the computer as much. (Tr. 223). She *Page 7 
stated that she only dated two men that she met online during the time period between removals and noted that the child's father had been one of the men she met through internet dating. (Tr. 238).
 {¶ 17} Finally, the guardian ad litem's report was entered into evidence. The report reviewed the history of the cases. He alleged that the mother demonstrated a lack of ability to care for her child and little maternal bonding. He opined that additional opportunities for improvement would be futile. He explained that the apartment was in a deplorable condition nearly the entire time since reunification. The guardian ad litem pointed out that the mother lost her job due to a lack of transportation after she lent her car to a drunk man she barely knew, who wrecked the car after running from the police. The guardian ad litem referred to her internet dating and concluded that she was unable to make choices that are safe for her children. He calculated that the child had been in agency care for nineteen of her forty-four months of life. He noted that the child has become defiant and oppositional and will only get worse if returned to the mother who cannot sustain a level of adequate care.
 {¶ 18} On October 3, 2006, the juvenile court granted permanent custody to DJFS. The court noted certain facts such as that the mother engages in internet dating and that one of the dates resulted in physical abuse to the mother. The court pointed out that the mother failed to address the issues with her home even after being warned that DJFS would return in five days to take custody if improvements were not made. The court expressed the most concern with the issues regarding the child's safety such as the bulbless lamp, unprotected cleaning supplies and garbage. The court found that continuation in the home would be detrimental to the child's welfare and found that reasonable efforts of reunification were made. The court concluded by clear and convincing evidence that permanent custody is in the best interests of the child. The mother filed timely notice of appeal from that judgment.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 19} The mother sets forth three assignments of error, the first of which contends: *Page 8 
 {¶ 20} "THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILD TO THE STATE WITHOUT FIRST SERVING NOTICE UPON THE FATHER."
 {¶ 21} The mother cites a case out of this court for the proposition that the failure to serve the father with notice of the permanent custody hearing precluded the trial court from granting permanent custody to DJFS. See In re Stephens, 7th Dist. No. 2000CO02, 2001-Ohio-3264, citing In Re Call (April 12, 2001), Cuyahoga App. No. 78376. There, we reversed a termination of parental rights decision concerning the mother. Id. We found that the notice by publication to the father was procedurally inadequate because there was no affidavit indicating that his residence was unknown and unable to be ascertained with reasonable diligence. Id. We concluded that the permanent custody order was void and that the mother was prejudiced by the defective service upon the father because the trial court did not consider whether the children could have been placed in his custody. Id.
 {¶ 22} DJFS distinguishes the cases cited by the mother. For instance, in the case at bar, the court was not required to find that the child could not or should not be placed with either parent within a reasonable time due to the "twelve of twenty-two" provision. Moreover, this is not a service by publication case as the father's address was known. DJFS points out that the father failed to attend any hearings in the present case. Thus, his absence at the permanent custody hearing was no surprise. Most importantly, DJFS establishes that the father was in fact served with notice.
 {¶ 23} Factually, the mother makes two statements regarding notice here. First, she claims that the notice of hearing on the motion to change custody from protective supervision to temporary custody does not list the father. However, it appears that she was reviewing only one of the two hearing notices that went out on April 27, 2006 to give notice of the June 14, 2006 hearing. Docket Number 43 specifically establishes that the father, Michael M., was served with this notice by certified mail, for which he signed. This mailer is file-stamped May 8, 2006.
 {¶ 24} Second, the mother states that there is no indication that the court provided the father notice of the hearing on the state's permanent custody motion. The docket establishes that on July 25, 2006, a hearing on the motion was scheduled for *Page 9 
September 5, 2006. The father was immediately sent a certified mailing containing this hearing notice. (See Docket Number 57). The first notice was left for the father on July 29, 2006 and the second notice was left on August 4, 2006. The mailing was returned unclaimed on August 15, 2006. Then, the father was served with the hearing notice by regular mail with a certificate of mailing stamped August 24, 2006. We also note that the same methods were used to serve the mother, and she specifically states that she is not contesting her service.
 {¶ 25} Lastly, the mother cites R.C. 2151.29. This statute provides that where the person's address is known, service can be made by leaving notice at the usual place of abode or by certified or regular mail. Here, the father's address was known and he was served by regular mail after the certified mail was unclaimed. Under all of the foregoing facts, we conclude that service was properly made in this case. As such, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 26} The mother's second assignment of error provides:
 {¶ 27} "THE TRIAL COURT ERRED IN ITS APPLICATION OF R.C. 2151.414, AS THE STATUTE VIOLATES THE EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS PROVISIONS OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION."
 {¶ 28} If a child has been in the temporary custody of the agency for twelve or more months of a consecutive twenty-two month period, then the agency with custody shall file a motion requesting permanent custody of the child. R.C. 2151.413(D)(1). At the hearing on the motion, the court may grant permanent custody to the agency if the court determines by clear and convincing evidence that it is in the best interest of the child to grant permanent custody of the child to the agency and that any of the following apply:
 {¶ 29} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the *Page 10 
child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 30} "(b) The child is abandoned.
 {¶ 31} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 32} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." R.C. 2151.414(B)(1).
 {¶ 33} The child is considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home. R.C.2151.414(B)(1)(d). Here, the parties do not dispute that the child was in the temporary custody of DJFS for more than twelve months in a consecutive twenty-two month period.
 {¶ 34} Thus, under the terms of the statute, the court need not find that the child cannot be placed with either of the parents within a reasonable time or should not be so placed. In re Nice (2001),141 Ohio App.3d 445, 459. Rather, after finding that the R.C. 2151.414(B)(1)(d) time frame has passed, the court can proceed to evaluate the child's best interests. See id.
 {¶ 35} The mother, however, believes that such process is unconstitutional because it does not require a finding that she is unfit or unsuitable. She characterizes the finding on placement with either parent in R.C. 2151.414(B)(1)(a) as a finding of unsuitability and urges that constitutionally the placement finding should be applicable to her case regardless of the alternate "twelve of twenty-two" provision in R.C. 2151.414(B)(1)(d). She notes that in custody cases where a non-parent is challenging a parent's custody under R.C. 2151.23(A), unsuitability is required. See State v. Perales (1977),52 Ohio St.2d 89, 99. She argues that application of a mere best interests test in cases where the "twelve of twenty-two" provision applies ignores the parent's general issues, the specific circumstances in the case and the adequacy of case planning. *Page 11 
 {¶ 36} She acknowledges that multiple courts have found the arguments she presents regarding the unconstitutionality of R.C. 2151.414(B)(1)(d) to lack merit. However, she points to the rationale of a dissenting opinion from the Eleventh District in support of her contention that the trend among the appellate courts needs overturned because a presumption of unfitness based upon time spent in custody is unconstitutional. SeeIn re Stillman, 155 Ohio App.3d 333, 2003-Ohio-6228 (O'Neal, J., dissenting). That dissent opined that the time provision is arbitrary and does not require the court to consider important facts that may have resulted in the length of the removal. Id. at ¶ 78. The dissent also opined that the best interests analysis unconstitutionally fails to require the court to find a parent is unfit or unsuitable to raise the child. Id. at ¶ 81.
 {¶ 37} The mother acknowledges that R.C. 2151.414(B)(1)(d) allows time spent in temporary custody in any case to count toward the twelve months as long as it is part of that last twenty-two months. However, the mother suggests that it is fundamentally unfair to use time against her that the child spent in temporary custody in the first case where she successfully completed the case plan in that case.
 {¶ 38} Before addressing the general constitutional arguments, we note that the circumstances of her case can be viewed in the opposite manner as urged by appellant. That is, both cases arose as a result of the same type of behavior by the mother. Thus, the second case just means that DJFS was mistaken in its prior belief that she was reformable. Looking back, the fact that she completed the first case plan does not demonstrate much accomplishment when she quickly reverted to the same ways that caused removal in the first place. This is distinguishable from a case where the mother successfully completed a case plan for some issue and then another issue arises. Rather, here, there is a failure to maintain the behavior the mother led DJFS to believe she could maintain. We now proceed to address those constitutional arguments that generally apply in most cases.
 {¶ 39} But first, we must point out that an appellate court need not address allegations of an unconstitutional statute on appeal where the issue was not brought to the trial court's attention. See State v.Awan (1986), 22 Ohio St.3d 120, 123. "[W]hile we are rejecting the proposition * * * that `* * * a claim of unconstitutionality of *Page 12 
legislation is never waived,' neither are we adopting a position at the other extreme that a constitutional issue first raised on appeal must never be considered." See id. at 124 (Celebrezze, J. concurring). Thus, the court can but need not address the issue.
 {¶ 40} Here, the mother was aware that DJFS was proceeding under the "twelve of twenty-two" theory. Their permanent custody motion made this abundantly clear. Various appellate courts have declined to address the constitutional argument raised by the mother here on the basis of waiver. See, e.g., In re Roberts, 5th Dist. No. 04CA29, 2005-Ohio-2843, ¶ 15;In re Dailey, 10th Dist. No. 04AP-1346, 2005-Ohio-2196, ¶ 25 (one of several from the Tenth District); In re K., 8th Dist. No. 83410, 2004-Ohio-4629, ¶ 13; In re K.S., 9th Dist. No. 21913, 2004-Ohio-2660, ¶ 8-9; Stillman, 155 Ohio App.3d 333 at ¶ 30 (recognizing that waiver does not prohibit an appellate court from considering a constitutional challenge to a statute, but declining to address the constitutional challenge to R.C. 2151.414(B)(1)(d)).
 {¶ 41} Thus, we could wholly refuse to address the issue based upon waiver. Yet, we shall note the waiver doctrine and continue to analyze the issue.
 {¶ 42} Some time ago, the Supreme Court decided a case outlining the standards for granting permanent custody to the state after the child had been declared dependent. In re Cunningham (1979), 59 Ohio St.2d 100. The Court noted a judicial reluctance to grant permanent custody and recognized that the right to raise one's own children is essential, specifically pointing to due process and equal protection. Id. at 104-105. The Court concluded that the best interests test was the paramount concern, not parental fitness. Id. at 105-106. The Court declared:
 {¶ 43} "Moreover, the concepts of `parental unfitness' and `best interests' of the child are not always unrelated issues, and very often a consideration of the former may enter into the analytical process of ascertaining the latter. (FN7).
 {¶ 44} "The court in Petition of New England Home for LittleWanderers (1975), 367 Mass. 631, 636-637, 328 N.E.2d 854, 858 noted that overlap as follows:
 {¶ 45} "`While we find force in the mother's arguments, we believe they are based essentially on a misunderstanding of the relationship between the notions of `best interests of the child' and parental `unfitness.' The mother perceives the two criteria or tests as separate and distinct, with each to be applied in certain clearly *Page 13 
defined circumstances. We think that the relationship is more subtle, that elements of parental `unfitness' figure strongly in the `best interests' test, while elements of `best interests of the child' weigh in any consideration of whether a parent is fit to have custody of his child.'" Id. at 106-107.
 {¶ 46} Thus, even after considering the due process and equal protection guarantees, the Ohio Supreme Court determined that there is no requirement necessitating a finding of parental unfitness as a prerequisite for granting permanent custody in cases where a child has been adjudicated abused, neglected or dependent. Id. at 108.
 {¶ 47} More recently, the Court held that an adjudication of abuse, neglect or dependency implicitly involves a determination of the unsuitability of the parents. In re C.R., 108 Ohio St.3d 369,2006-Ohio-1191, ¶ 22. The court noted that it considered both itsPerales and Cunningham decision and the different statutes involved in various types of child custody cases. Id. The Court concluded that when a juvenile court adjudicates a child to be abused, neglected or dependent, it has no duty to make a separate finding at the dispositional hearing that a non-custodial parent is unsuitable before awarding legal custody to a non-parent. Id.
 {¶ 48} Even the dissent in that case appears to agree that unsuitability is implicit and need not be separately made after the adjudication of abuse, neglect and dependency, at least as to the parent to whom the adjudication applied. Id. at ¶ 25 (Pfeifer, J. dissenting) (finding the majority's holding too sweeping due to the failure to consider that the appealing non-custodial parent was not involved in the reason for the abuse, neglect or dependency adjudication). Although theC.R. case involved only legal custody, rather than permanent custody, the reasoning and ultimate holding remains true across all dispositions.[1] That is, based upon the C.R. rationale, the trial court here did in fact find the mother unsuitable because her child was already adjudicated dependent in this case and such adjudication inherently contained a finding of unfitness. *Page 14 
 {¶ 49} Lastly, we note that other appellate districts have concluded that the "twelve of twenty-two" provision in R.C. 2151.414(B)(1)(d) is constitutional, often holding that a finding that the parents are unable, unsuitable or unfit to care for the child is inherent in the lengthy removal. See, e.g. In re Unger, 5th Dist. No. 04CA6,2005-Ohio-2414, ¶ 63-66; In re Bray, 10th Dist. No. 04AP-842,2005-Ohio-1540, ¶ 7-9; In re Workman, 4th Dist. No. 02CA574, 2003-Ohio-2220, ¶ 39-40; In re Fricke, 3d Dist. Nos. 1-02-75, 1-02-76, 1-02-77, 2003-Ohio-1116, ¶ 9. See, also, In re K., 8th Dist. No. 83410 at ¶ 17 (failure to raise below is not ineffective assistance of counsel due to convincing appellate case law of other districts). Stated differently, the legislature has determined that if a child has been adjudicated and is in temporary custody for the statutory time period, then the parent is necessarily unable, unsuitable or unfit to care for the child. Workman, 4th Dist. No. 02CA574 at ¶ 39.
 {¶ 50} The above cites merely constitute a sampling of the plethora of case law on the issue from these districts; each of these districts has similar cases pronouncing the same doctrine. See, e.g., In re V.M., 10th Dist. No. 06AP-144, 2006-Ohio-4461, ¶ 9; In re Villanueva/Hampton, 5th Dist. No. 2004CA120, 2004-Ohio-4609, ¶ 12; In re Gomer, 3d Dist. No. 16-03-19, 2004-Ohio-1723, ¶ 31. The Supreme Court has been provided with the chance to address the precise issue but declined. See In reThompson, 10th Dist. No. 02AP-557, 2003-Ohio-580, ¶ 23, discretionary appeal not allowed, 98 Ohio St.3d 1515, 2003-Ohio-1572.
 {¶ 51} As aforementioned, appellant relies only on the dissent in the Eleventh District's Stillman case for her position and cites no appellate court majority that has ruled against the trend. SeeStillman, 155 Ohio App.3d 33 at ¶ 69-93 (O'Neal, J. dissenting). We note that like the dissent in C.R., the dissenter in Stillman was also concerned with the fact that the father lost custody when only the mother's actions caused removal. Id. at ¶ 89. Here, however, the mother is the one appealing, and it is her behavior that caused the removal and adjudication. We also note that the Supreme Court denied review inStillman as well. In re Stillman, 101 Ohio St.3d 1425, 2004-Ohio-123. Finally, the appellate decisions we cite as the trend were all decided prior to the Supreme Court's recent C.R. decision, which provides further support for the position espoused by those appellate courts. *Page 15 
 {¶ 52} In conclusion, a "twelve of twenty-two" finding bypasses the statutory requirement that the child cannot or should not be placed with either parent in a reasonable period of time. A finding that the child has been adjudicated and in the agency's custody for twelve of a consecutive twenty-two month period implicitly involves a finding of unsuitability. See, e.g. Workman, 4th Dist. No. 02CA574 at ¶ 39-40. Moreover, an adjudication of abuse, neglect or dependency implicitly involves a determination that the parent is unsuitable. In re C.W.,108 Ohio St.3d 369 at ¶ 22. Finally, the best interests test takes unsuitability into consideration in granting permanent custody after an abuse, neglect or dependency adjudication. In re Cunningham (1979),59 Ohio St.2d 100, 106-107. Considering all of the foregoing items, we refuse to hold that the lack of a statutory provision specifically requiring consideration of a separate unfitness or unsuitability test is constitutionally invalid. Thus, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 53} The mother's third and final assignment of error alleges:
 {¶ 54} "THE TRIAL COURT'S DECISION TO GRANT DJFS' MOTION FOR PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 55} The mother generally contests the weight of the evidence and also makes various specific arguments here. First, the mother complains that the court's finding on page three of its entry that the child "has been out of the home for at least twelve out of the twenty-two months," is an insufficient finding that the child has been in the temporary custody of DJFS for twelve months of a consecutive twenty-two month period.
 {¶ 56} However, the mother's own statement of the facts establish that the child has been in the temporary custody of DFJS for twelve or more months of a consecutive twenty-two month period. That is, the motion for permanent custody was filed on July 26, 2006. Twenty-two months prior to this is September 26, 2004, which is thus the start of our time frame. On that date, the child was still in temporary custody from a prior order. From September 26, 2004 until the child was first returned to the mother, nine and one-half months passed. Then, the child was adjudicated *Page 16 
again on January 27, 2006; six months passed from that date until the date of the permanent custody motion for a total of fifteen and one-half months of temporary custody. See R.C. 2151.414(B)(1)(d) (a child shall be considered to have entered the temporary custody of an agency on the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home, whichever is earlier).
 {¶ 57} In any case, the mother seems to only protest the sufficiency of the language, not the merits of the decision. Although the court's language is inexact, talismanic language is not required.
 {¶ 58} Next, the mother complains that the child's counselor, Dr. Teoli, only met with the child two times, which she claims is insufficient to make an informed decision. She also states that the counselor never saw mother-child interactions. She alleges that Dr. Teoli's testimony was a surprise. Finally, she concludes that the court should have provided an opportunity for her to secure her own expert to rebut this witness.
 {¶ 59} At the first hearing, the case worker noted that the child recently made sexual allegations and that she has begun counseling. The case worker specifically named Dr. Teoli as the counselor and provided the dates of two sessions. (Tr. 80). The mother's attorney objected to the case worker testifying as to what Dr. Teoli may have said. Counsel stated that he had not been provided with records. He asked the court for time to review the records and for the opportunity to call Dr. Teoli. (Tr. 81). The court stated that it would accept the case manager's testimony only to show that the child was in counseling, not to prove the truth of her allegations or the diagnosis.
 {¶ 60} Subsequently, the hearing was continued for two weeks. DJFS called Dr. Teoli as its first witness. Thus, the mother's counsel did not need to resort to calling this witness himself as he seemingly had intended from his statements at the first hearing. When, Dr. Teoli was called at the second hearing, there is no indication that the mother's counsel objected. Thus, surprise was unlikely.
 {¶ 61} Moreover, although counsel had asked to review the records and to call Dr. Teoli, he did not seek evaluation of the child by a different expert. As such, this situation is distinguishable from the case cited by the mother where the appellant had unsuccessfully requested both a continuance and appointment of an expert to rebut *Page 17 
the agency's expert since unfamiliar psychiatric terms were utilized in the agency's expert's report. In re Brown (Nov. 26, 1986), 1st Dist. No. 850878.
 {¶ 62} This leaves us with Dr. Teoli's opinion testimony, which is subject to simple weight of the evidence review for credibility. We shall discuss weight of the evidence in the best interests findings below. In doing so, we shall address the mother's remaining arguments. For instance, she claims that she proved she could maintain her apartment once, and she should have a second chance to try again. She notes that her two older children were unexpectedly required to live with her right after her reunification with the child at issue here, which caused too much strain on the household and encumbered the mother's already limited housekeeping abilities.
 {¶ 63} Additionally, she complains that the efforts to reunify were lacking because the case plan had no medical component as did the prior case plan. She points to evidence of substantial attachment between the child and herself and notes her dutiful attendance at the weekly visitation. The mother also states that she demonstrated progress in dealing with her personal issues. Specifically, she points to her employment since removal, her claimed decrease in internet usage and her stability in housing as she has lived at this apartment for more than one year. She also states that the trial court failed to consider the relationship of the child with her half-siblings as required by R.C.2151.414(D)(1).
 {¶ 64} As aforementioned, even after finding that the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, the court cannot grant permanent custody to DJFS unless it finds by clear and convincing evidence that permanent custody is in the child's best interests. R.C. 2151.414(B)(1). In determining the best interests of a child, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 65} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; *Page 18 
 {¶ 66} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 67} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 68} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 69} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D).
 {¶ 70} The divisions referred to immediately above deal with convictions of certain listed offenses, withholding medical treatment or food, creating substantial risk of harm two or more times due to alcohol or drug abuse combined with treatment failures, abandonment and involuntary termination of parental rights regarding a sibling. R.C.2151.414(E)(7)-(11).
 {¶ 71} Clear and convincing evidence is that which produces in the mind of the fact-finder a firm belief or conviction as to the facts sought to be established. In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368. An appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the court's judgment. State v. Schiebel (1990),55 Ohio St.3d 71, 74-75, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80; C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279. This is true even where clear and convincing evidence is the standard. Schiebel, 55 Ohio St.3d at 74.
 {¶ 72} Here, there was strong evidence that the child loves her mother and the mother loves the child. See R.C. 2151.414(D)(1). However, evidence showed that the relationship was more like friends and less like parent-child with little discipline and supervision. It is surprising the mother asks us to consider the child's relationship with the twelve-year-old half-brother since the most recent allegations out of the mouth of the child at three and one-half years of age accuse this brother of raping her both orally and vaginally. This relationship can be determined to have no weight. *Page 19 
 {¶ 73} Additionally, the child's relationship with the fourteen-year-old half-sister was only shown in a negative light by the evidence presented. That is, this young lady has had a boyfriend sleep over night in this small two-bedroom apartment where the three children share a bedroom. The mother stated in front of the child during visitation that there was a rumor that the half-sister was pregnant. This half-sister told the child that the boogieman is real. She also advised the child that the boogieman killed a baby outside of the home, which in turn made the child afraid of her home. The child had nightmares which included her mother, her half-brother, her half-sister and the boogieman. There was no evidence of relationships with any other significant people. See id.
 {¶ 74} The child's wishes were not considered as she is too young. However, the guardian ad litem reported that the mother was a futile case for reform. He believed that the child if returned to the mother would remain in an unsafe and unsanitary environment with minimal supervision. He recommended termination of parental rights so that the child could begin her readjustment process. See R.C. 2151.414(D)(2).
 {¶ 75} Next, there was evidence of a custodial history that was erratic. See R.C. 2151.414(D)(3). As aforementioned, the child was in the temporary custody of the agency for more than twelve months of a twenty-two month consecutive period. See id. Specifically, she was there for fifteen and one-half months of a consecutive twenty-two month period ending on the date of the permanent custody motion. She was in temporary custody since the motion, and she was in temporary custody prior to the twenty-two month period as well. See R.C. 2151.414(D) (allowing consideration of any other factor).
 {¶ 76} Additionally, there was evidence that the child was in dire need of a legally secure placement. See R.C. 2151.414(D)(4). One could determine that there was some competent and credible evidence that stability could not be achieved without grant of custody to the agency because the mother had poor prospects for reforming the habits found to require removal. See id.
 {¶ 77} None of the factors in R.C. 2151.414(E)(7) through (11) apply. See R.C. 2151.414(D)(5). However, the court can consider other factors as well. See R.C. *Page 20 2151.414(D). As for these other considerations, the mother talked about finding an apartment large enough for all three children but at the same time blamed the household distress and lack of ability to keep a safe home on the addition of the older children to her home, not to mention the problems with the current need to keep the half-brother away from the child.
 {¶ 78} Moreover, the child's best interests require a safe home. The mother's home, after prior removal and five-day advance warning, contained two electrocution hazards, various suffocation hazards and multiple poisoning hazards. Thus, notwithstanding DJFS employees' personal opinions on the acceptable dating pool for a mother and on the proper level of unclean laundry, there is adequate evidence that permanent custody is in the child's best interests.
 {¶ 79} Considering all of the testimony and evidence presented in this case, one could disbelieve the mother's claim that her house was unsanitary and unsafe merely because the older children were "sprung" on her. An important consideration is the fact that she was given five days warning about the pending removal in the absence of improvement, yet the pictures demonstrate that she still did just about nothing to improve the deplorable condition of her home. It was as if she actually desired removal, believing it would be temporary again. Contrary to her assertion, the fact that she once maintained her house is not some proof of her ability; rather, her quick downfall from a temporary norm establishes her inability to maintain an appropriate atmosphere for a small child.
 {¶ 80} As with all testimony, the court could assign the proper weight to Dr. Teoli's testimony concerning a post-traumatic stress disorder diagnosis considering that she only met with the child two times. In assessing Dr. Teoli's recommendation in general, the court could note that Dr. Teoli previously interacted with the mother in the past counseling of the two older children. As aforementioned, appellant did not seek an expert to counter Dr. Teoli. Nor did she seek an expert to testify about her own medical conditions in a way that would support her current position that her depression and attention deficient disorder are the reasons for her issues and that her conditions need further assessment. Where the mother was already evaluated, diagnosed and *Page 21 
prescribed medication in the first removal case, such redundancies are not required, especially where she is continuing her counseling and medication monitoring.
 {¶ 81} Based upon the foregoing, the trial court could rationally weigh the evidence in favor of permanent custody by determining that such is in the child's best interests. There was some competent and credible evidence to support that best interests decision.
 {¶ 82} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, J., concurs. Waite, J., concurs.
[1] The significance of the legal custody disposition (as opposed to permanent custody) seemed to have more to do with the Court's willingness to apply the implied unfitness label to the non-custodial parent who was not involved in the abuse, neglect or dependency findings. Id. at ¶ 23-24. *Page 1